Paul **BENDER**, Plaintiff,

**George and Diane DeCarlo, et al.,**
**Plaintiffs-Appellants,**

v.

**SOUTHLAND CORPORATION,**
**Defendant-Appellee.**

No. 83–1525.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 18, 1984.
Decided Dec. 7, 1984.

George DeCarlo, Diane DeCarlo, Charles Spinks, Shirley Spinks, pro se.

Steven P. Resnick (argued), Bereano & Resnick, Annapolis, Md., for plaintiffs-appellants.

Francis E. Bentley, David Ettinger, Mark J. Spooner, Boris Feldman, Arnold & Porter, Peter Bleakley (argued), Washington, D.C., for defendant-appellee.

Before EDWARDS and CONTIE, Circuit Judges, and BELL, District Judge.[*]

---

[*] The Honorable Samuel H. Bell, United States District Judge for the Northern District of Ohio, sitting by designation.

CONTIE, Circuit Judge.

The plaintiffs, who are franchisees of 7-Eleven convenience stores, appeal from a summary judgment rendered in favor of defendant Southland Corporation, the franchisor. The plaintiffs' complaint filed on October 2, 1981 accused Southland of vertical price fixing (Count I) and imposing a tying arrangement (Count II) in violation of 15 U.S.C. § 1 (Sherman Antitrust Act) and of racketeering (Count III) in violation of 18 U.S.C. § 1962 (Racketeer Influenced and Corrupt Organizations Act, *i.e.*, RICO). The district court dismissed the RICO count and subsequently granted Southland's motion for summary judgment on the vertical price fixing and tying arrangement counts. We affirm both the dismissal of the RICO claim and the summary judgment on the tying arrangement claim and reverse the summary judgment on the vertical price fixing claim.

## I.

The allegations underlying Count I may be summarized as follows. The plaintiffs contracted with Southland to operate 7-Eleven convenience stores in the 1970s. Although Southland suggests retail prices and recommends inventory suppliers, the standard franchise agreement expressly provides that a franchisee is not required either to charge the suggested retail price or to purchase inventory from recommended vendors. The plaintiffs contend, however, that Southland in fact requires them to do both of these things through the operation of its retail inventory accounting system and through pressure exerted by its representatives.

Southland's retail inventory accounting system measures inventory shortages and overages for which the franchisees are contractually responsible (Kanawyer affidavit at 8). Under this system, a franchisee's inventory is valued at Southland's suggested retail price unless the franchisee notifies Southland of a different actual retail price.

The franchisee must complete one line on a form provided by Southland for each product on which the franchisee wishes to deviate from the suggested retail price. Moreover, if a franchisee purchases inventory from a nonrecommended vendor, the franchisee must forward the invoice to Southland together with information about the actual retail price being charged. Furthermore, Southland does not permit franchisees to make permanent price changes. Instead, a franchisee must submit a price change report whenever Southland changes the suggested retail price, even though the franchisee may not have changed the actual retail price.

The plaintiffs do not contend that retail inventory accounting systems are inherently suspect under the Sherman Act. In fact, the plaintiffs appear willing to report all retail price changes and to report, one time, the retail prices of items purchased from nonrecommended suppliers. The plaintiffs object, however, to Southland's requirement that they repeatedly report *unchanged* actual retail prices whenever suggested retail prices change or whenever purchases are made from nonrecommended vendors.

The plaintiffs assert that since dozens of suggested price changes occur in a sixty-day period on the several thousand items stocked in their stores, they are forced to follow Southland's suggested retail prices, which are higher than the prices they wish to charge, on sixty to seventy percent of their items. The plaintiffs claim that although they wish to charge lower prices on more items, they cannot do so because of the extraordinary amount of paperwork that would be involved. Moreover, the plaintiffs contend that partially because of Southland's reporting requirements, they must purchase sixty-five to seventy-five percent of their inventory from recommended suppliers even though these vendors charge between ten and forty percent more than nonrecommended suppliers.[1] These higher wholesale costs are reflected in the actual retail prices. The plaintiffs

claim that Southland has intentionally structured its retail inventory accounting system to insure that high prices will be maintained at franchisees' stores.

The plaintiffs also allege that Southland, through the conduct of its representatives, has forced them to honor its suggested retail prices and to purchase inventory items from recommended vendors. The plaintiffs rely upon the affidavits of Diane DeCarlo and Shirley Spinks to support this claim. The plaintiffs contend that because they independently price thirty to forty percent of their inventory items and purchase twenty-five to thirty-five percent of their inventories from nonrecommended vendors, they have been subjected to frequent dishonoring of price change forms (resulting in inventory shortages), abusive audits (including nighttime audits and findings of unusually large inventory shortages), late payments by Southland of payrolls and franchisee draws, threats of terminating the plaintiffs' franchises, threats of Southland opening competing 7-Eleven franchises and visits during which Southland representatives have forced the plaintiffs to conform their prices to Southland's suggested retail prices.

Count II of the complaint involves a provision in the standard franchise agreement requiring franchisees to deposit their daily proceeds, save for amounts used to pay nonrecommended vendors, into Southland accounts at Southland-approved banks. These accounts are accessible only to Southland and Southland retains all interest earned on the accounts. The standard franchise agreement further provides that Southland will pay the franchisees' operating expenses (*e.g.*, inventory costs and payroll) from the funds contained in these accounts. Moreover, Southland is obligated to disburse the franchisees' draws from these accounts.

According to Southland, the daily deposit requirement has three purposes (Kanawyer affidavit at 14). First, the deposits provide Southland a fund from which to pay its

---

1. The alleged tying arrangement is also said to contribute to this problem.

franchisees' operating expenses. Second, the deposits are part of the security interest that Southland possesses in most·franchisees' inventory.[2] Third, the daily deposit requirement helps the company to collect its share of a given store's profits. The plaintiffs' complaint alleges that the daily deposit system is a tying arrangement in which "the surrender of the right of the franchisee to manage the proceeds of his own business" (complaint at 9) is tied to the awarding of a 7-Eleven franchise (the tying product).

Count III of the complaint asserts that Southland, through use of the mails, has engaged in racketeering activity. Southland is alleged to have charged the plaintiffs for expenses that Southland had not paid from the plaintiffs' deposited funds, charged the plaintiffs royalties on sales that never occurred and required inventory suppliers to designate certain allowances as advertising allowances so that these sums would not have to be credited to the plaintiffs' accounts. Under the franchise agreement, advertising allowances need not be credited to the franchisees.

The district court dismissed Count III pursuant to Federal Rule of Civil Procedure (FRCP) 12(b)(6) on the alternative grounds that the plaintiffs had inadequately alleged mail fraud (the predicate unlawful conduct for purposes of this RICO claim), that plaintiffs had not pleaded fraud with particularity as required by FRCP 9(b) and that RICO does not apply to business organizations like Southland which have no connection with organized crime.

The district court also granted Southland's subsequent motion for summary judgment on Counts I and II. As to the vertical price fixing claim, the court held that whether Southland's retail inventory accounting system had caused the plaintiffs to follow suggested retail prices more than they would have otherwise presented a genuine issue of material fact. On the other hand, the court held that no genuine issues of fact remained on the elements of intent and coercion. Moreover, the court held that since the plaintiffs had not appealed from a magistrate's order imposing sanctions for having unsatisfactorily answered Southland's interrogatories about damages, they were precluded from obtaining monetary relief. The court further ruled that the absence of evidence on damages rendered injunctive relief unavailable.

The district court granted· summary judgment to Southland on the tying claim primarily on the ground that surrendering the right to manage the proceeds of a business is not a product or a service for purposes of tying arrangement analysis. The court further held that even if a tied product or service were involved, the plaintiffs were precluded by the magistrate's order from demonstrating any entitlement to monetary or injunctive relief.

## II.

■ Before addressing the vertical price fixing, tying arrangement and RICO claims in detail, several preliminary points merit discussion. First, this case involves a summary judgment granted to defendant Southland by the district court. Although the use of summary procedures certainly is not prohibited in antitrust cases, *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir.1983), summary judgment motions in antitrust litigation are disfavored. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Bouldis*, 711 F.2d at 1324. Accordingly, this court must strictly apply, *id.*, the general rule that the party seeking summary judgment must *conclusively* show that there exists no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979) (emphasis in original). The evidence and all reasonable inferences which may be drawn therefrom must be viewed in the light most favorable to the party opposing the sum-

---

**2.** Although not required to do so, most franchisees finance their inventories through South-land because the company charges lower interest rates than regular lending institutions.

mary judgment motion. *Id.; Bouldis,* 711 F.2d at 1324.

█ Two points raised by Southland concerning the evidence that this court may consider in deciding this case must also be addressed. First, the company contends that because the DeCarlo and Spinks affidavits contain hearsay, argumentative statements and legal conclusions, the affidavits must be totally disregarded. Southland correctly argues that the DeCarlo and Spinks affidavits contain much inadmissible material and that this material may not be considered by this court. *See State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 264 (6th Cir.1979) (hearsay); *Turoff v. May Company,* 531 F.2d 1357, 1362 (6th Cir.1976) (hearsay); *Patmon v. Van Dorn Co.,* 498 F.2d 544, 546–47 (6th Cir.1974) (unsupported opinions). The affidavits do, however, contain some statements of fact within the personal knowledge of DeCarlo and Spinks. This information may be considered.

█ Second, Southland invokes the rule that the plaintiffs may not attempt to raise genuine issues of material fact by filing affidavits that contradict their previous deposition testimony. *See Reisner v. General Motors Corp.,* 671 F.2d 91, 93 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982); *Radobenko v. Automated Equipment Corp.,* 520 F.2d 540, 544 (9th Cir.1975). Southland contends that the DeCarlo and Spinks affidavits contradict their deposition testimony because they admitted during deposition that they frequently deviated from Southland's suggested retail prices and purchased inventory items from nonrecommended vendors. Southland submits that these admissions conclusively demonstrate that it has not intentionally coerced the plaintiffs into maintaining high prices at their stores.

Assuming arguendo the correctness of the proposition of law cited by Southland, we do not agree that the DeCarlo and

Spinks affidavits contradict their depositions. The DeCarlo and Spinks affidavits admit that the plaintiffs deviate from Southland's suggested retail prices on thirty to forty percent of their inventory items and purchase twenty-five to thirty-five percent of their inventories from nonrecommended suppliers. The plaintiffs' theory, however, is that they wish to exercise even greater pricing and purchasing freedom and are prevented from doing so by the particular accounting system under review and by the actions of some of Southland's representatives. Indeed, the district court expressly held that an issue of fact exists as to whether the plaintiffs would have exercised greater discretion in the absence of the policies and conduct being challenged. We conclude that taking into account the DeCarlo and Spinks affidavits in deciding this case does not contravene the rule articulated in *Reisner* and *Radobenko.*

█ A final preliminary point is that the plaintiffs have contended that the alleged vertical price fixing and tying arrangement constitute *per se* violations of the Sherman Act. Since the plaintiffs have not argued this case under the Rule of Reason, we do not undertake that analysis.

### III.

█ The Supreme Court has long held that vertical price fixing is a *per se* violation of § 1 of the Sherman Act. *See Monsanto Co. v. Spray-Rite Service Corp.,* —— U.S. ——, ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984); *Albrecht v. Herald Co.,* 390 U.S. 145, 151–53, 88 S.Ct. 869, 872–73, 19 L.Ed.2d 998 (1968); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 47, 80 S.Ct. 503, 513, 4 L.Ed.2d 505 (1960); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). *See also* ABA Antitrust Section, *Antitrust Law Developments 2d,* 64 (1984).[3] The practice is unlawful because it

---

**3.** In the recent *Monsanto Co.,* case, the Solicitor General of the United States filed an *amicus* curiae brief urging the Court to reconsider the *per se* violation rule adopted in *Dr. Miles Medi-*

restricts the freedom of traders who are at lower levels of the product or service distribution system to set their own prices. *See Kiefer-Stewart*, 340 U.S. at 213, 71 S.Ct. at 260; *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203, 1205 (10th Cir.1982). Establishing a *per se* violation of the Sherman Act in a private action brought under a vertical price fixing theory requires proof of four elements. First, the defendant must have intended to fix prices charged by traders at lower levels in the distribution system. *See Monsanto Co.*, 104 S.Ct. at 1471; *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *aff'g* 478 F.Supp. 243, 259 (E.D.Pa.1979); *Mowery v. Standard Oil Company of Ohio*, 463 F.Supp. 762, 767 (N.D.Ohio 1976), *affd.*, 590 F.2d 335 (6th Cir.1978). Second, the defendant must have coerced the plaintiff into charging higher or lower prices. *See AAA Liquors*, 705 F.2d at 1206; *Carlson Machine Tools, Inc. v. American Tool, Inc.*, 678 F.2d 1253, 1261 (5th Cir.1982); *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 52–54 (2d Cir.1980); *Santa Clara Valley Distributing Co., Inc., v. Pabst Brewing Co.*, 556 F.2d 942, 945 (9th Cir.1977); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1356 (9th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Antitrust Law Developments*, at 60.[4] Third, the defendant's conduct must have caused antitrust injury. *See General Cinema Corp. v. Buena Vista Distribution Co., Inc.*, 681 F.2d 594, 596 (9th Cir.1982); *Belk-Avery,*

*Inc., v. Henry I. Siegel Co. Inc.*, 457 F.Supp. 1330, 1336 (M.D.Ala.1978). Finally, a plaintiff must show an entitlement to relief.

 We hold that the district court erred in finding no genuine issue of material fact concerning whether Southland intended to fix prices. One feature of Southland's retail inventory accounting system is particularly troublesome. Although franchisees clearly must be required to report retail price changes and retail prices being charged on items purchased from nonrecommended vendors so that Southland's records of actual retail prices will be accurate,[5] Southland has never explained why franchisees must again report *unchanged* actual retail prices whenever Southland alters its suggested retail prices. In light of the substantial paperwork burden that this requirement purportedly creates, and further in light of the absence of any apparent reason why the requirement exists, a reasonable jury could infer that Southland has imposed the requirement with the intent to discourage deviations from its suggested retail prices.

Furthermore, Exhibits F, 11 and 12, attached to the district court's opinion, show that Southland has instructed auditors and management personnel to monitor price compliance by franchisees. Exhibit F demonstrates that Southland regards deviations from suggested retail prices as being contrary to its best interests. Although the documents in question do not directly

---

cal Co. The Court refused to consider this argument on the ground that the defendants had not presented it either in the district court or on appeal. We note that Southland has not challenged the *per se* violation rule at any time during this litigation.

**4.** The plaintiffs assert that they need not prove coercion, citing *Albrecht.* The Supreme Court stated in that case, however, that a plaintiff may assert a "combination" between a defendant and himself "as of the day [plaintiff] *unwillingly* complied." 390 U.S. at 150 n. 6, 88 S.Ct. at 872 n. 6 (emphasis supplied). Consequently, *Albrecht* supports the notion that coercion must be demonstrated in a private action brought under a vertical price fixing theory.

**5.** We reiterate that the plaintiffs have not argued that retail inventory accounting systems are inherently suspect under the antitrust laws. Although the requirement of reporting retail price changes and initially reporting retail prices being charged on items purchased from nonrecommended vendors might constrain retail pricing discretion, not every vertical arrangement affecting prices necessarily violates the Sherman Act. *See Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d 842, 846 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *AAA Liquors*, 705 F.2d at 1205. Since the plaintiffs have only argued that one element of Southland's retail inventory accounting system was created with the intent to fix prices, we do not consider the rest of the system.

instruct anyone to fix prices, and although Southland has in the past distributed documents concerning franchisees' pricing discretion, a reasonable jury could find from all the evidence that Southland collects price compliance information. Moreover, a jury could reasonably infer that Southland desires the information so that it may act in order to protect its interest in having franchisees comply with suggested retail prices. Indeed, the DeCarlo and Spinks affidavits specify numerous instances in which Southland representatives allegedly have used illegal tactics in order to obtain the plaintiffs' compliance with suggested retail prices. *See infra.* Viewing all the evidence and the reasonable inferences which may be drawn therefrom in the light most favorable to the plaintiffs, *see Smith,* 600 F.2d at 63, we conclude that whether Southland intended to fix prices presents a genuine issue of material fact.

 The district court also erred in finding no genuine issue of material fact on the coercion issue. Although Southland was entitled to suggest retail prices and to attempt to persuade the plaintiffs to follow them, *AAA Liquors,* 705 F.2d at 1206; *Carlson Machine Tools,* 678 F.2d at 1261; *Yentsch,* 630 F.2d at 53, it was not entitled to coerce the plaintiffs. Coercion in the vertical price fixing context is actual or threatened affirmative action, beyond suggestion or persuasion, taken by a defendant in order to induce a plaintiff to follow the defendants' prices. *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,* 691 F.2d 1335, 1343 (9th Cir.1982); *General Cinema,* 681 F.2d at 597; *Belk-Avery,* 457 F.Supp. at 1334. *See also Carlson Machine Tools,* 678 F.2d at 1261 (threatening to make a "meaningful event depend upon compliance or non-compliance" with suggested prices is coercion). Threatening to terminate a franchisee in order to induce compliance with suggested retail prices, for

example, is coercion. *See Yentsch,* 630 F.2d at 53; *Newberry v. Washington Post Co.,* 438 F.Supp. 470, 479 (D.D.C.1977).

We hold that if Southland intentionally created the requirement that franchisees report unchanged actual retail prices whenever suggested retail prices change in order to deter franchisees from exercising pricing discretion, this would constitute affirmative action of a coercive nature. Furthermore, we hold that the DeCarlo and Spinks affidavits allege numerous instances of coercive conduct on the part of Southland and its representatives. Both affiants claim that Southland refuses to honor some price change reports; DeCarlo asserts that Southland continues to refuse even after being notified of the problem. The refusal to honor price change reports results in inventory shortages chargeable to the plaintiffs. Although these errors eventually may be corrected, the plaintiffs must pay a penalty in the interim that is not refunded.

Both affiants also allege that in retaliation for not following Southland's pricing and purchasing policies, Southland representatives have threatened to distort, and have in fact distorted, inventory audits. Distorted audits cause the plaintiffs to be charged with shortages. Moreover, DeCarlo claims that because she expressed a desire not to follow a Southland promotion and because she argued with a company representative over retail price changes, Southland once untimely paid her payroll expenses and franchisee draw.[6]

The affiants further claim that because they exercise some pricing discretion and have expressed the desire not to purchase inventory items from recommended vendors such as the Southland Distribution Center, Southland representatives have threatened to terminate their franchises or establish competing franchises nearby. Finally, both affiants recount visits by South-

---

**6.** Although DeCarlo also charges that Southland "deliberately" made the payments late, we disregard that allegation because DeCarlo could not have personal knowledge of the company's ulterior motives. In reviewing the affidavits, we have disregarded all similar comments about Southland's purported motives. This does not mean, however, that Southland's objective conduct is not evidence of coercion or of an intent to fix prices.

land representatives occurring in 1979 during which the representatives forced the plaintiffs to change their prices on all candy bars.[7] In view of the claims in the plaintiffs' affidavits and further in view of Southland's failure to provide counter-affidavits of the auditors and managerial employees alleged to have been involved in these incidents, we hold that Southland has not conclusively shown the absence of a genuine issue of material fact on the coercion issue.

The third element in a private vertical price fixing action is causation. Since the district court found that an issue of material fact was present concerning whether this particular accounting system has prevented the plaintiffs from exercising greater pricing discretion, we pause only to emphasize that the specific acts enumerated above, if they occurred, could also have caused the plaintiffs to follow Southland's suggested retail prices more often than they would have otherwise.

In order to prevail on their vertical price fixing theory the plaintiffs must also be entitled to relief. The district court correctly held that the plaintiffs may not recover monetary relief because of the magistrate's order imposing sanctions against the plaintiffs for failing satisfactorily to answer Southland's interrogatories concerning damages. The magistrate's order precluded the plaintiffs from presenting evidence at trial relating to the information sought in the interrogatories. The plaintiffs never appealed this order to the district court. Contrary to the plaintiffs' assertion, they were represented by counsel when the magistrate's order was entered on October 27, 1982. The motion by plaintiffs' original counsel to withdraw was not filed until November 2, 1982 and was not granted until December 16, 1982. The plaintiffs have presented absolutely no jus-·

tisfication for their having failed to appeal the magistrate's order.

The district court erred, however, in ruling that the plaintiffs are precluded by the magistrate's order from obtaining injunctive relief. The plaintiffs need not show that they have already suffered actual injury in order to obtain injunctive relief; a showing of a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur" will suffice. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969); *Rosebrough Monument Co. v. Memorial Park Cemetery Association*, 666 F.2d 1130, 1147 (8th Cir.1981), *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). Of central importance is that the magistrate's order precluded the plaintiffs only from introducing information sought by Southland's interrogatories. Those interrogatories inquired solely about damages already suffered by the plaintiffs. Thus, the magistrate's order does not preclude the plaintiffs from introducing evidence of future threatened injury. Since the district court relied solely upon the magistrate's order in holding that the plaintiffs could not obtain injunctive relief (district court opinion at 14 n.5), the district court's ruling on the injunctive relief issue cannot stand.

In summary, we hold that a genuine issue of a material fact exists as to each of the elements of the plaintiffs' vertical price fixing claim. The summary judgment in favor of Southland on that claim must be reversed. On remand, the plaintiffs may pursue only injunctive relief.

## IV.

Count II of the complaint alleges that Southland has utilized an unlawful

---

**7.** Although DeCarlo recounts a similar incident occurring in 1982, the Southland representative in question was reprimanded at a meeting attended by DeCarlo. While Southland's reaction to this incident certainly is evidence that it has not engaged in coercion, we do not agree with

Southland either that the plaintiffs' affidavits allege only isolated or unauthorized actions that do not amount to coercion as a matter of law, *see Belk-Avery*, 457 F.Supp. at 1335, or that there is no issue of material fact on the coercion issue.

tying arrangement. A tying arrangement exists where a seller will sell one product (the tying product) only if the buyer will purchase a second product (the tied product). *See Bouldis*, 711 F.2d at 1329; *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1126 (6th Cir.1981). Such arrangements are *per se* violations of § 1 if the seller has "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Bouldis*, 711 F.2d at 1329–30; *Bell*, 660 F.2d at 1127. Such arrangements "serve hardly any purpose beyond the suppression of competition," *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953). Specifically, competitors of the seller are denied access to the market for the tied product solely because the seller has power in another product market. *See Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); *Bell*, 660 F.2d at 1127. Moreover, buyers are forced to forego a free choice between items in the tied product market. *Id.*

It bears emphasis that in order to have a *per se* unlawful tying arrangement, two distinct products or services must jointly be sold. *See Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969); *Bouldis*, 711 F.2d at 1330; *Bell*, 660 F.2d at 1127. In the present case, the awarding of a 7–Eleven franchise is one product. We agree with the district court, however, that "the surrender of the right of the franchisee to manage the proceeds of his own business" which accompanies the franchise is not a product or service sold by Southland. This condition simply is a contractual obligation that the plaintiffs find burdensome and now seek to escape.

The plaintiffs attempt to evade this point by asserting alternative tying arrangement theories. First, the plaintiffs claim that although Southland is contractually obliged to pay inventory invoices out of the funds deposited into accounts by the plaintiffs, Southland in fact delays paying, or sometimes refuses to pay, nonrecommended vendors. Moreover, the plaintiffs often have insufficient cash on hand to pay nonrecommended vendors because of the daily deposit requirement. Thus, the plaintiffs as a practical matter are forced to purchase the bulk of their inventories from recommended suppliers such as Southland Distribution Center. The plaintiffs conclude that sales of inventory items by recommended suppliers are tied to the awarding of 7–Eleven franchises.

Second, the plaintiffs contend that banking services at the Southland-approved banks have been tied to the awarding of 7–Eleven franchises. Southland is said to benefit from this arrangement because it retains the interest on the accounts. The plaintiffs purportedly pay for these services in the form of interest lost on accounts that could have been opened at banks of the plaintiffs' choice.

The problem with the plaintiffs' alternative theories is that neither was pleaded in the complaint. The only tied product identified either in the complaint or in the plaintiffs' answers to Southland's interrogatories (App. at 221) is the surrender of the franchisees' right to manage the proceeds of their businesses. As has been indicated, that contractual obligation is not a product or service for purposes of tying arrangement analysis. Since the plaintiffs' alternative tying arrangement theories are not properly before this court, we express no view on their merits.[8]

We further hold that the district court properly dismissed the RICO claim in which the plaintiffs allege that Southland committed mail fraud. The crime of mail fraud has two elements: a scheme or arti-

**8.** We do not address the other reasons relied upon by the district court in granting summary judgment on the tying arrangement claim.

fice to defraud and a mailing for the purpose of executing the scheme. *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *United States v. Talbott*, 590 F.2d 192, 195 (6th Cir.1978); *United States v. Schilling*, 561 F.2d 659, 661 (6th Cir.1977). This court has held that the scheme to defraud must involve:

> *[I]ntentional* fraud, consisting in deception *intentionally* practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. *[A scheme to defraud] requires intent to deceive or defraud.* [Emphasis supplied.]

*Epstein v. United States*, 174 F.2d 754, 765 (6th Cir.1949). *See also Schilling*, 561 F.2d at 662. This court has also held that the scheme to defraud must involve "misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir.), *cert. denied*, 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).

■ Count III of the plaintiffs' complaint is deficient in several respects. First, the complaint does not allege that Southland acted with intent to defraud. *See Epstein, supra.* Although intent is a state of mind that may be averred generally, FRCP 9(b), it must be alleged. Second, the plaintiffs' complaint does not allege what misrepresentations (or omissions) of material fact Southland made to the plaintiffs that they reasonably relied upon to their detriment. *See Van Dyke, supra.* Hence, the plaintiffs have inadequately alleged the requisite elements of mail fraud.

■ Moreover, FRCP 9(b) requires that fraud be pleaded with particularity. To satisfy FRCP 9(b), a plaintiff must at minimum allege the time, place and contents of the misrepresentation(s) upon which he relied. *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980); *Bosse v. Crowell Collier and Macmillan*, 565 F.2d 602, 611 (9th Cir.1977); *Windsor Associates, Inc. v. Greenfeld*, 564 F.Supp.

273, 280 (D.Md.1983). The complaint at best alleges that Southland breached the franchise agreement in charging the plaintiffs certain expenses and royalties and in not crediting certain allowances to the plaintiffs' accounts. Since the plaintiffs' RICO allegations are inadequate, that count was properly dismissed.[9]

### V.

The summary judgment in favor of Southland on the vertical price fixing claim is REVERSED and the claim is REMANDED for further proceedings. The plaintiffs may seek to obtain only injunctive relief on that claim. The dismissal of the RICO claim and the summary judgment in favor of Southland on the tying arrangement claim are AFFIRMED.

---

**9.** We do not address the issue of whether a business entity must be affiliated with organized crime in order to be liable for damages in a private civil RICO action.