Juanita KNIGHT, Plaintiff,

v.

BANKERS LIFE AND CASUALTY
COMPANY, Defendant.

Civil No. 98–40125.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 11, 1998.

Rodney M. Brown, Lopatin, Miller, Southfield, MI, for plaintiff.

Catherine B. Edwards, Kerr, Russell, Detroit, MI, for defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

The above-entitled action commenced with the filing of plaintiff Juanita Knight's complaint on March 19, 1998. Plaintiff claims that her husband died an accidental death, a result of choking on food which caused aspiration pneumonia. Plaintiff seeks payment of $100,000 from defendant Banker's Life and Casualty Company (hereinafter "BLCC"), pursuant to the terms of her deceased husband's insurance policy. On October 9, 1998, defendant filed the instant motion for summary judgment. On November 3, 1998, plaintiff Juanita Knight filed her answer to defendant's motion. On November 24, 1998, defendant submitted a reply brief. Oral argument on the instant motion was heard by this Court on December 2, 1998.

For the reasons set forth below, the Court will deny defendant's motion for summary judgment without prejudice.

## I. FACTUAL BACKGROUND

William Knight, a retired Ford employee, opted for insurance coverage under a group accident insurance policy issued by defendant BLCC on July 1, 1994. *See* Exhibit A to Defendant's Motion. The policy provided for accidental death and dismemberment insurance. The policy, however, contained a number of exclusions including losses "*caused or contributed to by* bodily infirmity, sickness or disease ... medical or surgical treatment (except medical or surgical treatment necessitated only due to an injury)." *Id.* (emphasis added). In addition, Mr. Knight's Optional Accident Insurance Plan also described the optional accident insurance benefits available to Ford hourly retired employees effective July 1, 1994. With respect to the accidental death policy, the booklet states that "[b]enefits are payable only if death is the result of an accident...." *Id.*

Mr. Knight died on May 11, 1995 at William Beaumont Hospital. The immediate causes of death, as identified on the Amended Certificate of Death, were "bilateral lower lobe pneumonia" and "aspiration." The type of death was identified as "natural". See Exhibit C to Defendant's Motion.

Juanita Knight, William Knight's widow and beneficiary, subsequently filed a Notice of Claim under the Ford Motor Company

Hourly Accident Insurance Plan, with respect to her husband's death. *See* Exhibit D to Defendant's Motion. The type of accident for which the claim was made was identified as "choking on food" at the Royal Oak Beaumont Hospital. On December 2, 1997, counsel for Juanita Knight, Rodney Brown, received notice from defendant BLCC that an investigation had determined that Mr. Knight did not die as a result of an accidental bodily injury, as required under the policy. Thus, defendant BLCC denied plaintiff's claim. *See* Exhibit E to Defendant's Motion.

Defendant has set forth a detailed description of Mr. Knight's pre-existing medical condition, and has described the days leading up to his death. Defendant points out that according to Dr. Jose Yanez, Mr. Knight's treating physician from May 14, 1977 until his death in 1995, Mr. Knight had been treated for hypertension, cardiac irregularity and cerebral antherosclerosis from which he had a stroke in July 1992. Since 1991, Mr. Knight also allegedly suffered from a neurological disorder associated with progressive motor dysfunction. This condition caused Mr. Knight to fall down backwards. After one such fall in 1991, Mr. Knight did not return to work at the Ford Motor Company.

From mid–1992 through 1994, according to defendant, Mr. Knight was treated by neurologist Mark Rottenberg, M.D., M.S. Dr. Rottenberg examined Mr. Knight on February 18, 1994, and noted that Mr. Knight was a 66 year old gentleman referred for evaluation for his balance and gait difficulties. In a letter dated February 21, 1994, referring to the February 18, 1994 examination, Dr. Rottenberg stated that Mr. Knight "admits to dysphagia with solids, getting stuck in his throat." *See* Exhibit H to Defendant's Motion. Dr. Rottenberg's conclusion as stated in the February 21, 1994 letter is that "[t]his patient's symptoms are most consistent with a diagnosis of progressive supranuclear palsy." *Id.*

Subsequent to the examination by Dr. Rottenberg, from July 12 through July 26, 1994, Mr. Knight was admitted into William Beaumont Hospital. He had fallen two days prior to his admission, and suffered a fractured left fibula. A diagnosis of progressive supranu-

clear palsy (PSP) was made during his stay at the hospital. *See* Exhibit J to Defendant's Motion. It was noted by multiple physicians that his condition was progressive and not usually responsive to treatment or medication. *Id.* Furthermore, it was recognized by physicians at that time that PSP causes patients to develop an inability to swallow as the disease progresses.

Defendant further cites a neurological report authored by Dr. A. Robert Spitzer during Mr. Knight's hospitalization on July 13, 1994. *See* Exhibit J to Defendant's Motion. Spitzer noted that the patient had a number of abnormalities upon examination, including hemiparesis,_impaired down gaze, bradykinesia, reduced emotional expression, and monotone speech. The doctor stated that "I tend to clinically favor the diagnosis of progressive supra nuclear palsy ... This also explains [Mr. Knight's] speech and swallowing difficulty which is all part of this syndrome." *Id.* As a result of a modified barium swallow study, Mr. Knight was placed on a dysphagia II diet, involving consumption of thickened liquids. A speech pathologist who saw Mr. Knight on July 14, 1994 noted that his dysphagia should be followed closely as progression was noted and patient had difficulty in eating. *Id.*

Mr. Knight was discharged from William Beaumont Hospital to the Georgia Bloomfield Nursing Home (GBNH) for progressive rehabilitation on July 26, 1994. *See* Exhibit K to Defendant's Motion. He remained at the home until August 24, 1994. While there, Mr. Knight was provided with a special diet due to his swallowing difficulties and was advised of the risk of aspiration pneumonia. According to defendant, he and his wife, the plaintiff herein, requested to have him off the thickened liquids that were recommended.

Subsequent to Mr. Knight's stay at GBNH, Mr. Knight was seen by another neurologist, Sid Gilman, M.D. *See* Exhibit L to Defendant's Motion. In a letter to Dr. Yanez dated December 13, 1994, Dr. Gilman related Mr. Knight's statement that he experienced occasional choking on both solids and liquids. This condition coupled with other symptoms led Dr. Gilman to conclude that

Mr. Knight most likely suffered from progressive supranuclear palsy. During the course of treatment with Dr. Gilman, the neurologist authorized home care for Mr. Knight. In addition, a speech pathology consultation was ordered. The plans and recommendations made by the speech pathologist included monitoring Mr. Knight's swallowing status.

Mr. Knight was discharged from home care which had begun on January 5, 1995. As the report indicates, Mr. Knight refused to allow his wife to grind food in the blender. *See* Exh. M to Defendant's Motion for Summary Judgment. Furthermore, Mrs. Knight "continued to state that the patient would do nothing, only what he wanted to, right or wrong, and that the patient was stubborn." *Id.*

On January 31, 1995, Mr. Knight registered as an out-patient at William Beaumont Hospital in order to have a second modified barium swallow study performed. *See* Exh. N to Plaintiff's Motion. The evaluation revealed a delayed weak swallow with pharyngeal collection and inconsistent penetration into the laryngeal vestibule during the swallow. A dysphagia II, diet was again recommended and Mr. Knight was instructed to take fluids slowly and alternate liquid and solid food boluses to help clear laryngeal collection. The patient was notified that without the use of Nutra–Thick to thicken liquids, Mr. Knight would likely aspirate a considerable amount of liquid upon swallowing it. He was also advised to avoid certain foods because he had recently experienced episodes of choking. *Id.*

On February 24, 1995, Mr. Knight underwent a micro direct laryngoscopy, an esophaagoscopy and an esophageal dilation at Troy Beaumont Hospital. *See* Exh. O to Plaintiff's Motion. The report states that Mr. Knight was having a considerable amount of aspiration during swallowing. *Id.* It further states that the patient had recently undergone a barium swallow showing some aspiration with certain types of foods.

On April 11, 1995, Mr. Knight arrived at the emergency room, unable to swallow any foods or liquids on the day prior to his admission. *See* Exh. P to Plaintiff's Motion. He also had a mucous obstruction in the back of his throat for the past three weeks which had become worse the day before his admission. The discharge summary from the April 11, 1995 admission reflects an admitting and expiration diagnosis of progressive supranuclear palsy. The chief complaint upon admission was dysphagia, i.e., difficulty with speech and swallowing functions. Both plaintiff and Mr. Knight refused placement of a PEG tube or the performance of a tracheotomy to enable Mr. Knight to eat. *Id.* The patient was offered hospice care, and the report of Dr. Jose Yanez indicates that "[t]he wife understands that his prognosis is grave and he is likely not to survive more than a few days to a week." *Id.*

Progress notes dated April 17, 1995 indicate that Mrs. Knight was feeding her husband pieces of banana and some mashed potatoes. *See* Exh. P to Plaintiff's Motion. The patient was choking and coughing when the food was given. Mr. Knight still refused placement of a PEG tube or performance of a tracheotomy. According to defendant, the patient then allegedly stated to Dr. Yanez, "I will just go to the happy hunting ground then." *Id.* The notes further indicate that Mrs. Knight was advised that her husband would choke to death without the performance of a PEG tube placement or tracheostomy. Aspiration pneumonia was considered a possibility at this time, but, according to defendant, the patient and the family did not want treatment. A progress notation dated April 20, 1995 states that "[p]atient and wife were both warned that this [i.e. aspiration pneumonia] would occur given patient's state. Both still refused PEG tube and insisted on PO [by mouth] feeds." *Id.*

On April 20, 1995, Dr. Yanez wrote a letter to Mrs. Knight indicating that he would be going out of town. The letter stated the doctor's opinion that Mr. Knight's prognosis was "very poor." Exh. Q to Defendant's Motion. The letter further stated that "without a tracheostomy or feeding tube, he will choke or starve to death" and that "[a]spiration pneumonia is almost inevitable." *Id.* Dr. Yanez concluded by stating that "[n]othing can improve this paralysis [of the esophogeal

muscles] and that is why food and liquids back up and choke him." *Id.*

The April 20, 1995 progress notes further reflect that hospital staff asked Mrs. Knight not to feed her husband due to the danger of aspiration. *See* Exh. P to Plaintiff's Motion. He ate nothing on April 21, 1995 and April 22, 1995. On April 22, 1995, the nursing staff notes indicate that .the patient is aware that he had trouble at times swallowing, but would like to eat. *Id.* On April 23, 1995, aspiration pneumonia was identified in the patient's x-ray and his progress was again noted to be poor.

Mr. Knight was allegedly insistent upon being fed orally. See Exh. P to Plaintiff's Motion. In so doing, he developed aspiration pneumonia. *See id.* On April 28, 1995, Mr. Knight appeared weaker and Dr. Spitzer, a neurologist, discussed the situation with the family, indicating that he was terminal and may succumb within the next few days. The family allegedly continued to refuse a PEG tube or tracheosotomy. On May 9, 1995, Mr. Knight was unresponsive and preparations were made to transfer him to the hospice center in the hospital. The next day, May 10, 1995, Mr. Knight was transferred. He died on May 11, 1995.

An autopsy on Mr. Knight was performed by Dr. Werner Spitz, M.D. on May 11, 1995, as requested by plaintiff. *See* Exh. R to Defendant's Motion. The autopsy report notes extensive areas of pneumonia within the lower lobes of both lungs. The amended certificate of death, also prepared by Dr. Spitz, states that the cause of death was "natural." *See* Exh. C to Defendant's Motion. The immediate cause of death is listed as bilateral lower lobe pneumonia due to or as a consequence of aspiration. *Id.*

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). In evaluating a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmovant, as well as draw all reasonable inferences in the nonmovant's favor. *See U.S. v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.Proc. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*,

> [t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Catrett*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,*

917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

### III. ANALYSIS

Defendant argues that there is no genuine issue of material fact with respect to whether plaintiff may collect beneficiary proceeds under William Knight's accidental death policy. According to defendant, the decedent died during a hospitalization for a progressive illness, which affected his ability to swallow foods and resulted in the development of aspiration pneumonia, the ultimate cause of Mr. Knight's death. Plaintiff contends that William Knight died as a direct result of his choking on food which had been fed to him by a nurse while he was a patient at William Beaumont Hospital. About one and one-half to two weeks prior to the date of his death, Mr. Knight was allegedly fed a large spoonful of scrambled eggs by a nurse. Upon attempting to swallow the eggs, Mr. Knight choked and, according to plaintiff, would have died but for the resuscitative measures that "brought him back." *See* Exh. 3 to Plaintiff's Response.

In support of plaintiff's contention that Mr. Knight's death was accidental, plaintiff has submitted a letter from Dr. Werner Spitz, the medical doctor who, as stated above, performed Mr. Knight's autopsy. In that letter dated June 20, 1997, Dr. Spitz responded to an inquiry from plaintiff's counsel regarding the cause of Mr. Knight's death. Dr. Spitz stated that "it is my opinion ... that the cause of [Knight's] death was aspiration pneumonia. The manner of death is accident." Exhibit 5 to Plaintiff's Answer to Defendant's Motion. The letter further stated that "[m]y opinion is based on the findings at the autopsy and the representation whereby ... Mr. Knight was being fed when he aspirated food into his airways. The presence of food in the lungs caused a violent infection with abscess formation and sepsis." *Id.*

In further support of her position, plaintiff has submitted an affidavit of Dr. Jose Yanez, Mr. Knight's treating internist for 18 years. *See* Exhibit 6 to Plaintiff's Answer to Defendant's Motion. Dr. Yanez maintains staff privileges at Beaumont Hospital. In the affidavit, Dr. Yanez maintains that it is his opinion that the cause of Mr. Knight's death was accidental. *Id.* Furthermore, the doctor states that "the choking incident was *independent of any disease process.*" *Id.* (emphasis added). In addition, plaintiff proffers another affidavit of Dr. Mark Rottenberg, another of Mr. Knight's treating physicians. Like Dr. Yanez, Dr. Rottenberg also states that Mr. Knight's death was *independent of and not directly related to* any disease process and that the cause of death was accidental. *See* Exhibit 7 to Plaintiff's Answer to Defendant's Motion (emphasis added).

After consideration of the evidence and affidavit testimony of both parties, the Court finds that defendant has not carried its burden of demonstrating that there is no genuine issue of material fact for the jury to decide. Defendant has presented ample evidence of a progressive illness, i.e., progressive supra nuclear palsy, in the years prior to Mr. Knight's death. However, in deciding a motion for summary judgment, the Court must construe all evidence and inferences to be drawn therefrom in the light most favorable to the non-movant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Plaintiff has submitted affidavit testimony of two doctors that the immediate cause of Mr. Knight's death was accidental choking on food which thereafter caused aspiration pneumonia. Moreover, the doctors both concur that Mr. Knight's death was *independent of and not directly related to* any disease process. Accordingly, there is a genuine issue of material fact as to whether Mr. Knight's death was indeed accidental and independent of his medical condition, on the one hand, *or,* on the other hand, was a result at least in part of his medical condition.

Defendant adamantly maintains that where an insured's death is the result of a *combination* of accident and pre-existing disease, it is well-settled in Michigan that the beneficiary may not recover under an insurance policy containing an exclusionary clause such as the one in the case at bar. *See Berger v. Travelers Ins. Co.,* 379 Mich. 51, 149 N.W.2d 441 (1967); *Ann Arbor Trust Co. v. Canada Life Assurance Co.,* 810 F.2d 591

(6th Cir.1987); *Criss v. Hartford Accident & Indemnity Co.*, 963 F.2d 373, 1992 U.S.App. Lexis 13288 (6th Cir. May 28, 1992). The cases cited by defendant are, however, inapposite. In *Berger*, plaintiff died after suffering injuries as a result of an automobile accident. *Id.* at 52, 149 N.W.2d 441. It was determined by the trial court that plaintiff's death resulted at least in part from arteriosclerotic heart disease. *Id.* at 53, 149 N.W.2d 441. The Michigan Supreme Court affirmed the lower court's ruling that the plaintiff-beneficiary was not entitled to recover under an insurance policy containing an exclusionary clause. *Id.* at 54, 149 N.W.2d 441. In the instant case by contrast, it is clear from the record that Mr. Knight died as the result of an accidental aspiration of food, but there has been no finding by the Court regarding the role that Mr. Knight's pre-existing medical condition may have played in causing his death.

In *Ann Arbor Trust*, plaintiff-decedent fell down stairs at his home, sustaining a laceration on his forehead. *See Ann Arbor Trust*, 810 F.2d at 592. Plaintiff subsequently died from internal hemorrhaging approximately eight days after his admission to the hospital. *Id.* At the trial, experts testified that plaintiff's death would not have occurred *but for* a pre-existing cirrhosis of the liver brought on by excessive alcohol consumption. *Id.* The Sixth Circuit held that

> when a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease; an exclusionary clause therefore precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease.

*Id.* at 593. In the instant case, however, there is a genuine dispute as to what part, if any, Mr. Knight's illness played in bringing about his demise. In addition, there has been no expert testimony, as there was in *Ann Arbor Trust Co.* that plaintiff's death

would not have occurred *but for* his pre-existing illness.

The decision of *Criss v. Hartford Accident & Indemnity Co.*, 1992 U.S.App. LEXIS 13288 (6th Cir. May 28, 1992), not recommended for full-text publication, also does not support defendant's position. In that case, the Sixth Circuit held that the plaintiff-beneficiary could not recover under an insurance policy containing an exclusionary clause, following an automobile accident involving her husband. *See Criss*, 963 F.2d 373, 1992 WL 113370, *4, 1992 U.S.App. LEXIS 13288, *15. In that case, plaintiff's husband was hospitalized following the accident, where it was determined that he also suffered from severe heart disease. *Id.*, 963 F.2d 373, 1992 WL 113370, *1, at *3. On the third day of hospitalization, the patient went into cardiac arrest and died. *Id.* The Sixth Circuit noted that "[i]t is undisputed that Albert Criss suffered from heart disease which was at least a *partial cause* of his death." *Id.*, 963 F.2d 373, 1992 WL 113370, *4at * 10 (emphasis added). By contrast, in the instant case, it *is disputed* as to the whether Mr. Knight's alleged pre-existing illness "was at least a partial cause of his death." There are two doctors who have submitted affidavit testimony and apparently will testify at trial that the choking incident was independent of any disease process and that the cause of death was accidental. *See* Exhibits 6 & 7 to Plaintiff's Response to Defendant's Motion.

In summary, defendant has filled the record with substantial evidence, in the form of hospital staff reports, discharge summaries, admissions forms, and other medical records of Mr. Knight, which establish that the decedent suffered from various symptoms associated with progressive supranuclear palsy. Despite this wealth of evidence, strongly suggesting that Mr. Knight died at least in part from a pre-existing disease process, defendant BLCC has nevertheless failed to satisfactorily establish that no genuine issue of material fact exists. As discussed above, plaintiff has effectively rebutted defendant's evidentiary showing by presenting various items, including a letter from Dr. Werner Spitz, the doctor who performed Mr. Knight's autopsy, an affidavit of Dr. Jose

Yanez, a treating physician of Mr. Knight since May 14, 1977, and an affidavit of Dr. Mark Rottenberg, a treating physician of Mr. Knight since November 21, 1991. The letter from Dr. Spitz states that Mr. Knight's death was accidental. The two affidavits unambiguously announce the doctors' medical opinion that Mr. Knight's death was accidental, and, more to the point, "independent of and not directly related to any disease process." Construing all evidence in the light most favorable to plaintiff, there appears to be a genuine difference of opinion as to the exact nature of defendant's death. It would be premature at this stage in the litigation for the Court to determine definitively whether or not Mr. Knight's death was the result of some pre-existing condition, an accident, or a combination of both accident and disease.

It should be noted, however, that defendant did not take any deposition testimony of the doctors upon whom the plaintiff relies. As the Court remarked at the hearing conducted on December 2, 1998, such deposition testimony may be crucial in elucidating the central issue of causation and may serve to further clarify the positions of the various doctors. Accordingly, this Court will extend discovery in the above-entitled matter to provide defendant with an opportunity to depose Doctors Spitz, Yanez and/or Rottenberg. After these depositions are taken, defendant then may submit a renewed motion for summary judgment, in the event that the new testimony supports such a motion. For these reasons, the Court will deny defendant's motion for summary judgment *without prejudice.*

### ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that defendant Banker's Life and Casualty Company's motion for summary judgment is **DENIED** *without prejudice.*

**IT IS FURTHER ORDERED** that the discovery period in the above-entitled case will be extended until February 1, 1998, so that defendant may take deposition testimony of Doctors Spitz, Yanez and/or Rottenberg.

**IT IS FURTHER ORDERED** that defendant's renewed motion for summary judgment will be due on or before February 16, 1998.

**IT IS FURTHER ORDERED** that the Final Pretrial Conference and trial date are adjourned pending disposition of defendant's renewed motion for summary judgment.

**SO ORDERED.**