AAA LIQUORS, INC., a Colorado corporation; A–1 Discount Liquors, Inc., a Colorado corporation; Al's Liquor Store, Inc., a Colorado corporation; Colorado Liquors, Inc., a Colorado corporation; Crazy Farmer Liquor, Inc., a Colorado corporation; Dayton Liquors, Inc., a Colorado corporation; Arthur W. Stencil, d/b/a Dickerson's Liquors; Robert N. Shacklett, d/b/a Eleventh Avenue Liquor House; Lorenz and Ruth Friend, d/b/a Friend Liquor Store; Gloria DiManna, d/b/a Geno's Liquors; Irvin Rubin, d/b/a Jr Liquors; John DeCicco, d/b/a King's Center Liquors; Martha L. Shacklett, d/b/a Kipling Liquors; Devon Talbert, d/b/a Northglenn Liquors; Robert McIntyre, d/b/a Old Town Liquors; Herman and Delores Flax, d/b/a Skyline Liquors; Sam Fireman and Arno Bruck, d/b/a Ted's Liquors; and Thorton Cork'n Bottle, Inc., a Colorado corporation, Plaintiffs-Appellants,

v.

JOSEPH E. SEAGRAM AND SONS, INC., d/b/a Calvert Distillers Company, Brown Vintners Company, and Seagram Distilling Company, Defendants-Appellees.

No. 81–1061.

United States Court of Appeals,
Tenth Circuit.

Dec. 3, 1982.

Certiorari Denied May 2, 1983.

See 103 S.Ct. 1903.

James C. Bull of Quiat, Bucholtz, Bull & Laff, Denver, Colo. (Irvin M. Kent, Denver, Colo., with him on the brief), for plaintiffs-appellants.

Macdonald Flinn, New York City (Allan Gropper, also of White & Case, New York City; and H. Thomas Coghill and David J. Richman of Coghill & Goodspeed, Denver, Colo., with him on the brief), for defendants-appellees.

Before HOLLOWAY, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Nineteen Denver liquor stores ("small retailers") appeal the trial court's holding that funding by Joseph E. Seagram & Sons, Inc. ("Seagram") of price discounts its Denver wholesaler, Midwest Liquor Co. ("Midwest"), offered only to a few large volume Denver liquor stores was not a "contract, combination, or conspiracy in restraint of trade" prohibited by section one of the Sherman Act, 15 U.S.C. § 1. The small retailers contend that Seagram's funding constituted a per se violation of the antitrust laws because it amounted to vertical price fixing in that (1) Seagram knew Midwest gave the discounts only to the large volume stores; (2) as a condition to funding Midwest's discount program, Seagram required Midwest to resell to the large volume stores at a given price; and (3) Seagram had agreed to fund Midwest's price discounts for the purpose of, and with the result of, affecting retail prices charged by those large volume stores.

The trial court found that Midwest had initiated the discount program so that the large volume retailers would sell Seagram's liquor at a price competitive with what they charged for competing brands such as Jim Beam and Ancient Age. The trial court held that Seagram had not violated section one because the "interaction between Seagram and Midwest did not amount to the concerted action necessary to constitute a conspiracy." It found that the discount program "resulted from Midwest's unimpeded independent research, analysis and motivation"; further, that "Midwest maintained complete control over the distribution and decisionmaking concerning Seagrams' brands." On appeal the small retailers argue that the trial court erred in not holding that Seagram committed a per se violation of the antitrust laws by engaging in vertical price fixing.

Many of the essential facts were stipulated and the others were largely undisputed. In the Denver area Seagram's most popular product is Seagram's 7 Crown, a moderately-priced blended whiskey competing principally with Jim Beam, Ancient Age, and Canadian Mist; Seagram's next most popular product is Seagram's V.O., a premium-priced Canadian blended whiskey competing principally with Canadian Club. Midwest, an independent liquor wholesaler, is the exclusive distributor for Seagram's products in the Denver area. Midwest does not sell those competing brands.

Discounts and special sales promotions are common merchandising techniques used by liquor wholesalers. The trial court found that Midwest, not Seagram, developed the challenged discounts and offered them to certain large volume liquor stores with the goal of increasing the market shares of 7 Crown and V.O. in Denver.[1]

---

1. Midwest routinely offered certain discounts and promotions to all retailers. Midwest did not always ask Seagram to fund these programs; even when asked, Seagram sometimes declined to fund a program or provided only partial funding.

Midwest then asked Seagram to reimburse Midwest the costs of the discounts, and Seagram agreed.[2]

At the time the discount programs went into effect, 7 Crown was selling in the large volume stores for over $9.00 per half gallon, and was losing ground to Jim Beam, Ancient Age, and Canadian Mist, which usually were selling for $8.19 per half gallon. The large volume stores were rarely advertising 7 Crown, but were heavily advertising the competing brands, often featuring them as loss leaders. During the discount program the large volume stores did advertise 7 Crown for as little as $7.99 per half gallon and significantly increased the amount sold.

The small retailers contend that Seagram's requirement that Midwest pass the discount through, and its acquiescence in the policy of passing it through only to the large retailers, had the effect of fixing the prices Midwest charged to the large retailers, who received the discount, and to the small retailers, who did not. Furthermore, they contend that the large retailers' prices also were fixed, to the detriment of the small retailers. If Seagram fixed the prices the wholesaler could charge all of the retailers, or if Seagram entered into an agreement, combination, or conspiracy to give a competitive edge to the large volume retailers, the small volume retailers have standing to sue.[3]

On appeal we have to consider only whether the record supports the trial judge's determination that section one of the Sherman Act was not violated under the facts of the instant case.[4] The district court found that Seagram did not attempt to fix prices charged by either Midwest or the retailers. It found that although Seagram assisted Midwest financially, the wholesaler maintained complete control over the distribution and decisionmaking concerning Seagram's products.

The small retailers assert that the record establishes as a matter of law an agreement, combination, or conspiracy affecting prices; they assert that once such an agreement is found the cases holding vertical price maintenance agreements to be per se violations of the Sherman Act render unnecessary any further inquiry except with regard to damages, which have been stipulated. *See California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 102–03, 100 S.Ct. 937, 941–942, 63 L.Ed.2d 233 (1980); *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568 n. 18 (1977); *Albrecht v. Herald Co.,* 390 U.S. 145, 153, 88 S.Ct. 869, 873, 19 L.Ed.2d 998 (1968); *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 405–09, 31 S.Ct. 376, 383–385, 55 L.Ed. 502 (1911). While we agree that resale price maintenance agreements are per se unlawful, all vertical arrangements affecting price do not constitute resale price maintenance agreements. "The crux of any price-fixing agreement is the relinquishment by a trader . . . of the freedom to set prices in accordance with his own judgment." *Chisholm*

2. In general, Seagram directly reimbursed Midwest the cost of the discounts. During one phase of the discount program, however, Seagram simply ensured Midwest a 10½% gross profit on sales of 7 Crown and V.O., which exceeded Midwest's prior profit figures and allowed it to offer substantial discounts.

3. The small retailers could have incurred damages of loss of profits or competitive disadvantage because they did not receive prices as low as the favored retailers. The parties stipulated to the amount of damages for which Seagram would be liable "if Seagram's support of any of [Midwest's discount programs] is found by the highest court which addresses the merits of the matter to violate the antitrust laws."

4. The small retailers initially charged Seagram with violating the Robinson-Patman Act, 15 U.S.C. § 13, asserting they were purchasers from Seagram within the meaning of the Act. The trial court ruled against the claim, finding that Seagram did not direct Midwest's price determinations or participate in any sales to retailers, that none of the allegedly discriminatory sales actually transpired "in interstate commerce," and that the promotion programs were not substantially adverse to the competitive environment. The small retailers did not appeal this holding; consequently, we express no opinion on its soundness.

*Brothers Farm Equipment Co. v. International Harvester Co.,* 498 F.2d 1137, 1142 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974). Although a supplier may suggest a resale price, *see, e.g., United States v. Parke, Davis & Co.,* 362 U.S. 29, 43–46, 80 S.Ct. 503, 511–512, 4 L.Ed.2d 505 (1960), the supplier may not coerce the seller's adherence to that suggested price, *see, e.g., Simpson v. Union Oil Co.,* 377 U.S. 13, 17, 84 S.Ct. 1051, 1054, 12 L.Ed.2d 98 (1964); *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 52–55 (2d Cir.1980); *Santa Clara Valley Distributing Co. v. Pabst Brewing Co.,* 556 F.2d 942, 945 (9th Cir. 1977); *cf. Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953) (tying arrangements condemned because they "coerce[ ] . . . abdication of buyers' independent judgment").

Here, no coercion was present. The small retailers do not contest the trial court's finding that Midwest initiated the discount program and voluntarily sought Seagram's financial support. They attack the court's finding that Midwest retained independent pricing judgment by pointing out that Seagram required the discounts given to Midwest to be passed through to the retailers. The small retailers rely upon *Pearl Brewing Co. v. Anheuser-Busch, Inc.,* 339 F.Supp. 945 (S.D.Tex.1972), a case quite similar to that before us, which held that conditioning a price reduction on an agreement by the recipient to reduce its price imposes restrictions on the recipient's freedom of decision, and thus constitutes unlawful price fixing. In *Pearl Brewing,* the court declared that the testimony of the individual wholesalers supported a conclusion that the brewer predetermined the wholesaler's exact price to the retailer and the retailer's exact price to the public, 339 F.Supp. at 957–58, a conclusion the trial judge did not make in the case before us. Furthermore, we do not agree with the conclusion in *Pearl Brewing.* A supplier who grants discounts to a retailer to permit the retailer to charge competitive prices has a legitimate interest in making sure the retailer receiving the discount "is not pocketing the price support instead of passing it on to consumers." *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 40 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *cf. Sun Oil Co. v. FTC,* 294 F.2d 465, 483–84 (5th Cir.1961) (suggesting that supplier may be in violation of price discrimination proscriptions if it grants price support to a retailer who does not lower its prices correspondingly), *rev'd on other grounds,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963).

We see no meaningful distinction between the instant situation and one in which during a gasoline price war a wholesaler seeks support from its supplier, who gives such support conditioned upon the wholesaler passing it on to the retailer who is seeking to meet competition. *Cf. Butera v. Sun Oil Co.,* 496 F.2d 434 (1st Cir.1974) (holding that discounts suppliers give retail outlets to permit them to meet local competition are not resale price maintenance agreements, because the retailers are free to select the price at which they sell); *Sun Oil Co. v. Vickers Refining Co.,* 414 F.2d 383 (8th Cir.1969) (allowing a formula that geared the supplier's price to competitive changes in the resale price level); *Sun Oil Co. v. FTC,* 294 F.2d 465; *Swettlen v. Wagoner Gas & Oil, Inc.,* 373 F.Supp. 1022 (W.D. Pa.1974), *aff'd mem.* 511 F.2d 1395 (3d Cir. 1975).

Requiring Midwest to pass on the price break granted by Seagram does not by itself constitute the coercion or pressure to maintain resale prices condemned in the decisions finding per se violations. Such a requirement does not prohibit the wholesaler from making greater reductions in price than the discount provides. Nor does it force the wholesaler to accept the price break at all. Seagram's guarantee of the gross margin of the wholesaler at 10½% did not amount to control of Midwest's wholesale prices or its distribution. Presumably Midwest is interested in maximizing profits, and would not offer a discounted price to a retailer unless it expected an increase in volume sufficient to offset the loss it would incur from lowering the price; presumably Midwest would discontinue the discount if

increased volume were not realized. The record supports the trial court's conclusion that Midwest retained control over its prices and over the distribution of Seagram's brands.

■ While Seagram undoubtedly expected that reduction in price by Midwest would allow large volume retailers to advertise a retail price sufficiently low to increase Seagram's market penetration, the record supports the conclusion Seagram did not fix retail prices. The retailers maintained control over their own prices; even though they were offered incentives to encourage price cutting, they were not coerced into offering a particular price or punished if they did not. *Cf. Lehrman v. Gulf Oil Corp.,* 464 F.2d at 40 (supplier may not bar recipient of price support from lowering price beyond amount of support); *Butera v. Sun Oil Co.,* 496 F.2d at 437 ("a meaningful event [must] depend upon compliance or non-compliance with [supplier's] 'suggested' or stated price").

The small retailers allege that even if the discount program did not impermissibly restrain the prices Midwest and the large volume retailers charged, the program was a per se violation of the Sherman Act because it was "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940). However, the *Socony-Vacuum* statement arose in the context of a horizontal conspiracy; it should not apply to vertical arrangements of the type involved in the instant case. L. Sullivan, *Handbook of the Law of Antitrust* § 141 (1977). *See, e.g., Butera v. Sun Oil Co.,* 496 F.2d 434 (1st Cir.1974) (frequent price changes by supplier in response to market conditions does not constitute resale price maintenance even though retailers, who sell at low profit margins, immediately adjust their prices according-

ly). Manufacturers' price changes have the natural effect of raising or depressing the retail price, and long term contracts between manufacturers and wholesalers have the effect of stabilizing retail prices. They should not be deemed unlawful price fixing arrangements.

■ Not only should we permit a supplier to lower its prices to help a retailer meet competition, but we should permit the supplier to start a price war. A retailer who believes its prices are not competitive must be allowed to ask the wholesaler or manufacturer to lower its prices so that the retailer can offer competitive prices. *Cf. Lehrman v. Gulf Oil Corp.,* 464 F.2d 26, 40 (5th Cir.) (supplier may grant price support to dealer who claims it needs support to match competitors' prices, as long as the supplier does not forbid dealer's lowering prices beyond amount of price support), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972). We do not think section one of the Sherman Act requires the manufacturer to offer the same price to all its customers or even to all in a particular geographical area.[5] If it were required to do so it would be inhibited from either starting or responding to a local price war. Such a holding would discourage competition rather than encourage it, contrary to the policy of the Sherman Act.

■ The trial court properly tested the alleged restraints under a rule-of-reason analysis, which requires scrutiny of the intent and effect of the restrictions. Seagram supported a pricing program whereby its wholesaler discriminated in pricing Seagram's liquors among different retailers in the Denver market. But there is no evidence that this was aimed at crippling the small retailers as competitors to the large volume liquor stores who received the lower wholesale prices. Rather, it is clear that the purpose of the discount program was to

---

**5.** The Robinson-Patman Act may prohibit price discrimination among customers if the Act's requirements are satisfied. But that Act also permits the defenses of meeting competition, 15 U.S.C. § 13(b), cost-differential, and chang- ing market, 15 U.S.C. § 13(a). The existence of these defenses shows that Congress considered price discrimination to be reasonable in at least these circumstances.

increase sales of Seagram's products vis-a-vis the major competing brands. While the parties stipulated to the fact and amount of damages, it is unclear whether those damages represent profits the small retailers could have made had they received the lower prices given to the favored retailers, or whether the damages represent a decline in sales volume due to a diversion of customers to the favored retailers. The court noted that three of the four small retailers who testified increased sales volume during the discount pricing period. The record establishes that the discount program had the effect of lowering retail prices to consumers and increasing interbrand competition. The ultimate test of legality, under the rule-of-reason analysis, is whether the particular restraint increases or impairs competition. *Martin B. Glauser Dodge Co. v. Chrysler Corp.,* 570 F.2d 72, 82 (3d Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). We agree with the trial court that Seagram's support of Midwest's discount program was not manifestly anticompetitive. The trial court's holding that there was no section one Sherman Act violation is AFFIRMED.