CAPITAL FORD TRUCK SALES, INC.
and William M. Anderson

v.

FORD MOTOR COMPANY.

Civ. No. 1:90–cv–507–ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 12, 1990.

---

Dirk Glen Christensen, Homer Lamar Mixson, Suzanne Forbis North, Bondurant Mixson & Elmore, Atlanta, Ga., for plaintiffs.

Carey P. DeDeyn, Laura Malynn Shamp, Sutherland Asbill & Brennan, Atlanta, Ga., Jill Nickerson MacDonald, Ford Motor Co., Dearborn, Mich., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This price fixing case is before the court on Defendant's motion to dismiss claims pursuant to Fed.R.Civ.P. 12(b)(6).

The essentials of this case revolve around the rather complex wholesale pricing mechanism between a truck dealer and a truck manufacturer. Plaintiffs, a truck dealership and its owner/dealer, entered into various agreements with Defendant, Ford Motor Co. ("Ford"), which established

Plaintiffs as wholesale buyers of trucks. A third party, Ford Credit, a subsidiary of Defendant, financed Defendant's purchases.

Plaintiffs describe the pricing mechanism roughly as follows. Plaintiffs buy trucks from Ford at a wholesale price. As manufacturer, Ford sets this price. In the normal course of business, Plaintiffs should then sell at a higher retail price which reflects their added costs and profits. But that higher retail price as seen by the retail consumer may not be competitive. Therefore, Ford has instituted a scheme which has the practical effect of reducing the wholesale price paid by Plaintiffs. This in turn should allow Plaintiffs to offer a competitive retail price.

The scheme, known as the "Competitive Price Adjustment" program ("CPA")[1], comes into play after Plaintiffs have bought from Ford but, presumably, just before a retail sale. Plaintiffs may submit a request to Ford for a wholesale price adjustment.[2] In a particular request, Plaintiffs must disclose their expected profit from the sale of the vehicle. Plaintiffs and Ford then arrive at a price adjustment. Ford arranges for a wholesale price break commensurate to the price adjustment. In theory, that adjustment should allow Plaintiffs to charge a retail price that reflects their profit requirements. Upon actual sale, Plaintiffs must disclose their actual profit to Ford. If actual profit exceeded the expected profit upon which the price adjustment was based, Ford then charges back to Plaintiffs an amount reflecting the higher profit. That is, Ford, it is alleged, retroactively increases the wholesale price to hold down Plaintiffs' profit to the previously expected amount. There is, then, a three-step process: initial wholesale purchase, wholesale price adjustment based on expected profit, and wholesale price re-adjustment (increase) based on actual (higher than expected) profit.

In their complaint, Plaintiffs say that Ford would intentionally set wholesale prices so high as to make a CPA request necessary as a matter of course. They allege that Ford knew that the wholesale prices it charged would not allow Plaintiffs to sell at retail with a reasonable profit. They further allege that in administering the CPA scheme Ford discriminated against them by giving larger wholesale price discounts to truck leasing companies, truck body companies, and other dealerships. As regards the mechanics of the payment arrangements, Plaintiffs say that Ford Credit wrongfully charged interest on the full wholesale price rather than on the price as determined pursuant to the first downward price adjustment.

The complaint also alleges, under the heading "Horizontal Price Fixing", that Ford negotiated sale prices directly with a consumer of trucks, Ryder Truck Rental, Inc. ("Ryder") and then required Plaintiffs to sell to Ryder at that price.

Additionally, the complaint alleges price discrimination by Ford in the sale of the CF-8000 truck. The complaint states essentially that Ford required dealers to purchase the CF-8000 at an artificially inflated price. Ford thereafter discovered that dealers would not be able to compete on price with dealers of similar trucks. Therefore, Ford sold to dealers its remaining inventory of the CF-8000 at a lower price. As it did this, it refused to grant concomitant CPA price adjustments to dealers who had already bought at the higher wholesale price.

Plaintiffs pray seven counts for relief. One count under the Federal Automobile Dealers' Day in Court Act, 15 U.S.C.A. § 1222, for failure to act in good faith; three counts under the Georgia Motor Vehicle Dealer's Day in Court Act, O.C.G.A. § 10-1-631(a)(1) (1989) for failure to act in good faith; one count of price discrimination under the Robinson-Patman Price Discrimination Act, § 1 *et seq.*, 15 U.S.C.A. § 13 *et seq.;* one count for breach of fiduciary duty; and one count for both vertical

---

1. In the context of sales to government entities, it is known as the "Government Price Concession" program.

2. Neither party makes an allegation as to when exactly—before or after a retail sale—Plaintiffs need submit a request for a price adjustment.

and horizontal price fixing under the Sherman Anti-Trust Act of 1890, § 1, 15 U.S.C. § 1.

Defendant Ford moves pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted the following: Plaintiffs' Sherman Act claim, that portion of the Robinson–Patman Act claim which asserts price discrimination on certain Cargo trucks, and the interest-overcharging portion of the Robinson–Patman Act claim. The court will address these three items seriatim.

As to Plaintiffs' Sherman Act claim, Ford says that the complaint fails as a matter of law to state facts that could establish that Ford engaged in either vertical or horizontal price fixing. As regards vertical price fixing, Ford says the complaint does not allege that Ford set the ultimate retail price or that Ford enforced a retail price in any manner. Nor does it allege that Ford sets a price floor, suggests an alternative price upon a CPA request, or coerces a dealer to keep to a specified price. It merely describes Ford's legally valid price assistance program. The complaint establishes that actual retail pricing remains in the hands of the dealer, Ford asserts. As regards horizontal price fixing, Ford argues that Plaintiffs have not alleged that an agreement existed between Ford and Ford's competitors to fix prices. The complaint merely details Ford's unilateral actions, it says, and that is not grounds for the assertion of horizontal price fixing.

Plaintiffs say in opposition that their complaint details the means by which Ford's intentional inflating of wholesale prices led to Plaintiffs' inability to escape dependence on the CPA scheme. Plaintiffs being thus dependent, Ford was in a position to set the ultimate retail price through the mechanism of the CPA price adjustment. Ford's approval of a particular price adjustment (reflecting a particular profit margin) and its enforcing of that price adjustment (and thus, the profit margin) through subsequent charge-backs amounted to vertical price fixing. As regards horizontal price fixing, Plaintiffs note that

their complaint mischaracterizes instances of vertical price fixing as horizontal. The complaint actually describes, they say, an additional instance of *per se* vertical price fixing wherein Ford negotiated a discounted retail price directly with Ryder Truck Rental, Inc. and required Plaintiffs to sell to Ryder at that negotiated discount price.

In reply, Ford attacks Plaintiffs' re-characterization of the Ryder matter as vertical price fixing. Ford argues that the fundamental elements for a colorable claim of vertical price fixing are lacking because the complaint does not allege that an agreement to fix prices existed among vertically aligned parties or that dealers such as Plaintiffs were required to sell to Ryder at pre-determined prices. Also in reply, Ford reasserts and elaborates upon the vertical price fixing arguments in its original brief.

In their supplemental response, Plaintiffs reassert and enlarge upon their previous arguments. They particularly seek to distinguish the facts of their case from cases cited as apposite by Ford. The court's analysis, *infra* takes up Plaintiffs' arguments on this score.

▆ To survive a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), it must appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Tiftarea Shopper, Inc. v. Georgia Shopper, Inc.*, 786 F.2d 1115, 1117–18 (11th Cir.1986). Further, in antitrust cases, " 'summary procedures should be used sparingly' " because of the fact-intensive nature of such claims. *Id.* at 1117 (quoting *Poller v. CBS*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962)). And the court should construe all allegations in the complaint in the light most favorable to the plaintiff and should accept them as true. *See Jenkins v. McKeithen*, 395 U.S. 411, 416–17, 89 S.Ct. 1843, 1846–47, 23 L.Ed.2d 404 (1969).

▆ Section one of the Sherman Act prohibits "every contract, combination ... or conspiracy, in restraint of trade." 15 U.S.C. § 1 (1976); *see Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d 842, 845 (8th Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873

(1984). To aid in the practical implementation of so harsh a rule, the courts have applied a rule of reason analysis to most putative restraints. *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 342, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982). Under such an analysis, the factfinder scrutinizes the intent and effect of the practice challenged and determines whether the particular practice increases or impairs competition. *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918).

■ However, combinations formed " 'for the purpose of and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity' " in interstate commerce are illegal *per se*. *Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d at 845 (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 841–42, 84 L.Ed. 1129 (1940)). It is no defense to *per se* price fixing that the agreement was designed to prevent abuses or evils of competition. *Arizona v. Maricopa County Medical Society*, 457 U.S. at 345, 102 S.Ct. at 2473–74. "In addition, courts have applied the per se rule in cases where, although the price-fixing scheme involved was more subtle ... repeated experience in analyzing such a restraint under the rule of reason showed that the plan had an anti-competitive effect on the market." *Lewis*, 714 F.2d at 845.

The court is mindful of the lenient standard for surviving a Rule 12(b)(6) motion but is convinced that Plaintiffs do not state a Sherman Act claim in so much of their complaint as challenges Ford's CPA scheme.

■ As a preliminary matter, the court notes that it would not be proper to look to a *per se* rule when analyzing Ford's CPA scheme as alleged in Plaintiffs' complaint. Plaintiffs implicitly concede by elaborating on the complex manner in which the CPA scheme allegedly results in Ford's fixing of retail prices that this scheme does not raise issues of horizontal price fixing; it is horizontal price fixing to which the *per se* rule most appropriately applies. *See AAA Liquors, Inc. v. Joseph E. Seagram & Sons*,

705 F.2d 1203, 1206–1207 (10th Cir.1982) (*per se* rule properly ignored in favor of rule of reason analysis in vertical price-fixing case); *Lewis*, 714 F.2d at 847 (8th Cir.1983) (citing *AAA Liquors* in concluding that district court erred in applying *per se* rule in vertical price-fixing case).

■ The parties do not point out and the court does not find binding authority in this Circuit addressing the questions presented by this case. Defendant points to the decisions in *Lewis* and *AAA Liquors, supra*, as persuasive authorities from other circuits, and the court concurs. *Lewis* is particularly instructive. The court held in that case that the district court erred as a matter of law in applying the harsh *per se* rule to a wholesale pricing scheme strikingly similar to Ford's; the court then went on to apply a rule of reason and ruled in defendant Mack Truck's favor, dismissing the plaintiff's price fixing claims as a matter of law. The court looked to another strikingly similar case, *AAA Liquors*, in concluding that a wholesale price adjustment scheme very like the one implemented by Ford did not impair competition. In fact, the court said that

> we fail to see how Mack's program can be characterized as anything other than competitive. If Lewis's representations in its requests for sales assistance are true, Lewis presumably would not be able to offer a competitive price without sales assistance. The ultimate consumer would therefore probably pay a higher price, and Lewis would make no sale or profit at all. Thus, the effect of the discount program, as in *AAA Liquors*, is to lower retail prices to customers and increase interbrand competition. Lewis offers no evidence to the contrary. Consequently, we conclude, as a matter of law, that Mack's discount program has not been shown to be manifestly anticompetitive and, under a rule of reason standard, does not violate section one of the Sherman Act.

*Lewis*, 714 F.2d at 848.

*Lewis* presents a host of compelling factual similarities to the instant case. Plaintiff truck dealer sued Defendant Mack

Trucks over Mack's version of a wholesale price relief scheme. The scheme there was functionally identical and in its details nearly identical to the scheme challenged here by Plaintiffs. Under Mack's "sales assistance program," Mack would reduce the wholesale price of trucks on a case-by-case basis when dealers could not compete at the prevailing wholesale price. To participate in the program, a dealer would submit an application to Mack setting forth the retail price it estimated it could obtain from a particular customer. Mack would, if appropriate in the given instance, reduce its wholesale price by an amount which would guarantee the dealer a specified minimum profit. After Mack and the dealer so agreed, Mack would build the truck to specification and sell it to the dealer at the unreduced, standard wholesale price. After the dealer sold the truck, the dealer would report back to Mack the final price and costs. If the dealer obtained a profit less than the standard minimum, Mack reduced the wholesale price and credited back the guarantee amount to the dealer. If, however, dealer profit exceeded the specified profit, Mack either granted no wholesale price credit-back or reduced it to the point where the dealer made the specified profit. *Lewis,* 714 F.2d at 843–844. *See also, AAA Liquors, supra.*

Plaintiffs distinguish the case at bar from *Lewis,* however, on three grounds. The court will dispose of one of these before moving on to the other two. First, Plaintiffs say that unlike the situation presented by *Lewis,* Defendant Ford here did in fact suggest alternative prices to Plaintiffs. This assertion goes to the availability of a *per se* analysis in this case. Plaintiffs clearly state, though, that what Ford suggested were alternative CPA wholesale price adjustments, not ultimate retail prices. Ford's actions were neither a direct nor an indirect fixing of prices. *Lewis,* 714 F.2d at 845–850.

In their second and third grounds for distinguishing *Lewis,* Plaintiffs note that in *Lewis,* the record upon which the court based its decision "contain[ed] no evidence of an intent on the part of Mack to 'cripple' its dealers." 714 F.2d at 847. In addition,

that court remarked that the record lacked any evidence that dealers could rarely make sales without price adjustments from Mack. *Id.* Plaintiffs say that the *Lewis* court relied on these facts in coming to its decision. And because their complaint explicitly states that "Ford Motor has overpriced its trucks at the wholesale on dealer level sold to its captive dealerships," that "Capitol Ford could sell virtually no vehicles without the CPA ...," and that Ford "knew" that the profits it was allowing dealers were insufficient, Plaintiffs conclude that the complaint alleges facts sufficient to overcome Ford's motion to dismiss.

These allegations regarding the number of non-CPA sales do not relevantly differentiate Plaintiff's price-fixing claim from that in *Lewis.* First, the *Lewis* court held that the plan itself as a matter of law was not anti-competitive. 714 F.2d at 848, quoted *supra.* This holding relied on the mechanics of the plan itself. And that plan was in all relevant respects identical to the one here. The court's holding was perhaps conditioned on the plaintiff's failure to present evidence showing anti-competitiveness. *Id.* But Plaintiffs here do not allege facts as to the ways in which Ford's plan is anti-competitive. Plaintiffs do allege that they were coerced into utilizing the CPA scheme; but proof of that allegation was not necessary for the *Lewis* court's ultimate conclusion. In addition, the plaintiff there had alleged the same coercion as do Plaintiffs here, but the court concluded that the purpose of the pricing plan was "not to force adherence to any particular price scheme" but to promote sales. *Id.* at 847. That is, the scheme was not anti-competitive as a matter of law because it was pro-competitive.

This holding makes sense if one steps back from the legal arguments and considers how Ford's CPA scheme works. Plaintiffs, as aforementioned, allege in their complaint that Ford consistently overpriced at wholesale to its dealers in order to coerce dealers in general and Plaintiffs in particular into depending upon the price adjustment scheme. Ford then used the scheme to deny dealers adequate profits.

As a consequence, of course, a dealer would be offering "low" prices to retail buyers—that is, prices lower than would have been possible without CPA. *See, id.* at 848. So consumers would appear to have incentive to buy the more competitively priced Ford vehicles, but Ford would be driving the suppliers to those consumers out of business by preventing their earning sufficient profits. The decision in *Lewis* avoids this highly unusual conclusion in favor of a more likely one: that a pricing scheme such as Ford's looks toward aiding dealers in responding to local price wars. *See id.; accord, AAA Liquors,* 705 F.2d at 1207; *Bryant Heating & Air Conditioning v. Carrier Corp.,* 597 F.Supp. 1045, 1050–51 (S.D.Fla.1984) (citing *Lewis*); *see also, Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 597–98, 106 S.Ct. 1348, 1361–62, 89 L.Ed.2d 538 (1986) (claim of an "economically senseless" pricing conspiracy should not have survived summary judgment motion).

■ Ford has also moved to dismiss a second, distinct allegation in Plaintiffs' complaint of a price-fixing scheme by Ford.[3] They concede in their response that their allegations regarding direct price negotiations by Ford with Ryder go to vertical, not horizontal, price fixing. They also assert that such actions by Ford constitute *per se* price fixing under the Sherman Act. In defense of their complaint, Plaintiffs cite *Greene v. General Foods Corp.,* 517 F.2d 635 (5th Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976) for the proposition that Ford's direct price setting as to sales to a third party, Ryder, may constitute a *per se* anti-trust violation. *Greene* exhaustively surveys the law in cases generally of manufacturers' setting prices at which distributors may sell to particular third parties; it declared the defendant's scheme in that case a *per se* anti-trust violation. 517 F.2d at 647–658 (manu-

facturer's separate pricing regime was "unabashedly calculated to effect the resale price and ... enforced by the coercive potential of summary termination and ... reduction in [price] allowances." *Id.* at 658.).

■ The rule being that resale price maintenance by manufacturers is usually a *per se* anti-trust violation, *id.* at 654, this court cannot say as a matter of law that Plaintiffs fail to state a claim on which relief may be granted. One comment by the *Greene* court is particularly helpful here:

> [t]he ban on resale price maintenance that has developed ... has in part been premised upon the belief that, when a manufacturer undertakes to distribute its goods through a chain of independent dealers, the consumers' ability to purchase at a free market price will be enhanced by the retailers' unfettered ability to set his retail price at the level he feels is most commensurate with local demand.

*Id.* at 656.

Here, Plaintiffs allege in their complaint precisely that "Ford Motor provides [Ryder] directly the pricing of new vehicles without consulting the Ford heavy truck dealer through which an order is to be placed." Complaint ¶ 68. Therefore, Plaintiff has stated a cognizable claim.

Ford attempts to distinguish *Greene* on the grounds that the court conditioned its holding on the unabashed coercion by the defendant manufacturer of its distributor. That additional element was clearly present in that case, but that is no reason why Plaintiffs should not be able to go forward here. At the threshold, Plaintiffs have stated a minimum claim, as the *Greene* court's extensive discussion of judicial disapproval of resale price maintenance would indicate.

---

**3.** Plaintiffs' "Count Five" contains claims of both vertical and horizontal price fixing. It is this latter allegation of horizontal price fixing which Plaintiffs concede to be another instance of vertical price fixing. While "Count Five" thus contains two independent claims for relief, Plaintiffs have made clear allegations as to each

claim elsewhere in the complaint. Therefore, the court will analyze the two claims of vertical price fixing separately and without regard to their being placed under the same count. Fed. R.Civ.P. 8(a), (f); *see,* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1363.

Additionally, Ford offers *Ryko Mfg. Co. v. Eden Services*, 823 F.2d 1215 (8th Cir. 1987), in support of its motion to dismiss Plaintiffs' second vertical price fixing claim. While there are factual similarities between that case and the case at bar, several factors rule it out as dispositive here. First, the court was reviewing a jury verdict for sufficiency of evidence. That entails a different standard of review than does a Rule 12(b)(6) determination as to whether a plaintiff's complaint states a claim. Second, the holding for the defendant there critically depended on certain findings of fact regarding an agency relationship between the plaintiff and the defendant. Plaintiffs here would necessarily need to proceed with their case in order to establish such facts. Finally, *Ryko*, an Eighth Circuit case, is not binding on this court.

 As to Plaintiffs' price discrimination claim, Ford argues that Plaintiffs merely state that Ford lowered its price subsequent to selling to Plaintiffs. It argues that Plaintiffs fallaciously assume that any seller which lowers its wholesale price must retroactively grant the lower price to prior buyers. It says that Plaintiffs' failure to allege that the new price was not available to them renders their claim insufficient.

The only authority offered by Ford in support of its position is *Shreve Equipment, Inc. v. Clay Equipment Corp.*, 650 F.2d 101 (6th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981). Ford quotes language from that court's recitation of law which appears to support Ford's argument. *Id.* at 105. However, as Plaintiffs point out, the decision there rested on grounds unrelated to the language quoted by Ford. There, the party alleging price discrimination had essentially forfeited the right to complain because he had entered into other advantageous agreements with the alleged price fixer. *Id.* at 106. The court's decision, therefore, did not depend upon its bare recitation of anti-trust law. *Id.* This being the only authority offered by Ford, and it being factually inapposite, there is insufficient grounds for dismissing so much of Plaintiff's complaint as alleges price discrimination in the sale of CF–8000 trucks.

 As to Defendant's motion to dismiss so much of Plaintiff's complaint as requests interest costs associated with Ford Credit's financing of purchases from Ford by Plaintiffs, the court finds Defendant Ford's contentions without merit. Ford says that because neither the Robinson–Patman Act nor the Sherman Act support such a claim, this court should dismiss it as a matter of law. But

> [i]t is a well-settled principle of law that a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint in order to determine if the allegations provide for relief on any possible theory.

*Bowers v. Hardwick*, 478 U.S. 186, 202, 106 S.Ct. 2841, 2849, 92 L.Ed.2d 140 (1986).

In the instant case, Plaintiffs state facts which add detail to an alleged larger scheme by Ford to injure them. Plaintiffs assert several claims for relief under several theories. Ford does not argue that Plaintiffs allegations as to interest overcharging are unavailable under all of Plaintiffs' theories. Therefore, the court will not prevent Plaintiffs going forward on this claim.

Accordingly, Defendant Ford's motion to dismiss is GRANTED IN PART and DENIED IN PART. Plaintiffs' claim in Count Five of the complaint insofar as it alleges vertical price fixing arising from Defendant's CPA scheme is hereby DISMISSED.

SO ORDERED.