John **GRIFFIN, an individual,**
**et al., Plaintiffs,**

v.

**NBD BANK, an Indiana corporation,**
**et al., Defendants.**

No. 1:98–CV–57.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 9, 1999.

Thomas W. Conklin, Luyendyk & Associates, Muskegon, MI, Siobhan M. Murphy, Conklin, Murphy & Conklin, Chicago, IL, for John Griffin and Hodgeon & Anderson Iron Works, Inc.

Richard A. Glaser, Rock A. Wood, Dickinson Wright, PLLC, Grand Rapids, MI, for NBD Bank.

Patrick E. Mears, James Robert Bruinsma, Dykema Gossett PLLC, Grand Rapids, MI, for Wayne Metal Products Co., Inc. and Haulin Trailers, L.L.C.

Jeffrey R. Hughes, Deborah I. Ondersma, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Ronald L. Onken and Rick Odle.

Randall Allen White, Scholten & Fant, PC, Grand Haven, MI, for E. Dale Fenton.

Keith R. Fafarman, Gambs, Mucker, Bauman & Seeger, Lafayette, IN, for Wabash National Corp.

## OPINION

QUIST, District Judge.

Plaintiffs, John Griffin ("Griffin") and Hodgeon & Anderson Iron Works, Inc. ("H & A"), have sued Defendants E. Dale Fenton ("Fenton"), Ronald L. Onken ("Onken"), and Rick Odle ("Odle") over a failed business venture known as ASI Manufacturing, Corporation ("ASIM"), in which Griffin, Fenton, Onken, and Odle were each 25% shareholders. Plaintiffs have also sued Defendant NBD Bank ("NBD"), which provided business loans to ASIM, and Defendants Wayne Metal Products Company, Inc. and Haulin Trailers, L.L.C. (individually "Wayne" and "Haulin" and collectively "Wayne/Haulin"), which purchased the assets of ASIM from NBD. In their complaint, Plaintiffs allege

that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968, and committed various state law torts and breaches of contract.[1] Now before the Court are: (1) Fenton's Motion to Dismiss the RICO claim; (2) Onken's and Odle's Motion For Summary Judgment on the RICO claim; (3) NBD's Motion for Partial Summary Judgment on the RICO claim and the state law conspiracy and breach of contract claims; and (4) Wayne/Haulin's Motion for Summary Judgment on the RICO claim and the state law conspiracy, account stated, quantum meruit, unjust enrichment, and conversion claims.

### I. Facts

#### A. The Parties

For several years prior to 1995, Fenton owned and operated a company located in Missouri known as ASI Industries ("ASI"). ASI sold various specialty trailers used to transport roof trusses, modular homes, and other items. The trailers which ASI sold were manufactured under certain patents which Fenton developed and acquired. Until approximately April 1995, Wabash National Corporation ("Wabash") manufactured the substantial majority of trailers sold by ASI. At that time, Wabash made a business decision to stop manufacturing specialty trailers for ASI.[2] Consequently, ASI was required to find new company to manufacture its trailers.

Onken was employed by Wabash as its director of purchasing until 1995, when he left to become ASI's vice president of operations. One of Onken's primary responsibilities while employed by ASI was to address ASI's need for a manufacturer of trailers. Odle was also employed with Wa-

---

1. Plaintiffs filed their original complaint in Muskegon County Circuit Court and Defendants removed the case to this Court pursuant to 28 U.S.C. § 1441.

2. Although Griffin contends that Wabash's decision was influenced by a dispute with Fenton over amounts owed by ASI, the evidence

in the record shows that the dissolution of the relationship between ASI and Wabash was fairly amicable. In fact, Griffin testified that Wabash gave its "blessing" to the new entity Fenton sought to create to manufacture the specialty trailers. (See Griffin Dep. at 48, attached to Onken's and Odle's Br.Supp.)

bash, as its vice president of sales. Odle remained employed by Wabash until November 1996 and was never employed by ASI.

Griffin, through H & A, which was located in Muskegon, Michigan, supplied parts to Wabash which were used to build the specialty trailers for ASI. Griffin met Fenton as a result of his dealings with Wabash.

NBD made loans to ASIM, which were personally guaranteed by Griffin, Fenton, Onken, and Odle. Wayne formed Haulin to purchase the assets of ASIM and guaranteed loans made by NBD to Haulin in connection with the purchase of those assets.

## B. The Formation of ASI

In July 1995, Fenton's son-in-law approached Griffin to determine whether he would be interested in assembling modular trailers for ASI. Griffin was interested in the proposition and eventually agreed to manufacture the trailers. Griffin set up a manufacturing facility in Muskegon through H & A and Michigan Industrial Metal Products, a company owned by Griffin's wife. Under his arrangement with Fenton, Griffin manufactured approximately 24 trailers.[3]

In approximately October 1995, Fenton and Griffin agreed to form a company to manufacture specialty trailers for ASI using the same facility that Griffin had used to manufacture the modular trailers for ASI. Fenton and Griffin agreed that as part of the venture, H & A would supply parts for the trailers. Fenton eventually brought Onken and Odle into the deal to help plan for the new company, ASIM. Onken and Odle supplied most of the technical and financial information for ASIM, which they obtained from Wabash. In connection with his investigation of the proposed venture, Griffin made several visits to Wabash's facility in Indiana to speak with their manufacturing personnel and confirm some of the information that he had received through Onken and Odle. (*See* Griffin Dep. at 47–50, attached to Onken's and Odle's Br. as Ex. A.) Griffin also confirmed in his visits to Wabash that Onken and Odle "had the background they said they did." (*Id.* at 51.)

Fenton, Griffin, Onken, and Odle prepared a business plan that substantially incorporated the provisions of an earlier business plan which Onken and Odle had prepared for another proposed specialty trailer manufacturing company. At Griffin's suggestion, Griffin, Fenton, Onken, and Odle approached NBD[4] to obtain financing for ASIM and presented their business plan to NBD for its review in an initial meeting held sometime in November 1996.[5] NBD approved the loans and

---

**3.** Griffin testified that he made money on the 24 modular trailers that he manufactured for ASI. (*See* Griffin Dep. at 52, attached to Onken's and Odle's Br.Supp.) However, due to a dispute over payment for some of the trailers, H & A and Michigan Industrial Metal Products sued ASI and Fenton in Missouri state court. That lawsuit has been dismissed without prejudice.

**4.** Griffin made the initial contact with NBD on behalf of the four shareholders.

**5.** The business plan contained a written representation that the shareholders had invested $240,000 in ASIM as of the time of the initial meeting with NBD. There is no indication in the record that Onken or Odle made any capital contribution to the business. Fenton contends that he invested approximately

$100,000 in parts for truss trailers which he purchased from Wabash. (*See* Brouwer Aff. ¶ 5, Fenton Br.Supp.Ex. E.) Griffin appears to take contrary positions about whether he made a capital contribution to ASIM. At different times in this litigation, Griffin has asserted that his contribution of approximately $60,000 in equipment was either a capital contribution or a sale or loan of equipment to ASIM, for which he expected payment. (*See* Griffin Dep. at 26, attached to Wayne's and Haulin's Br.Supp. (referring to contribution of equipment as either a debt from ASIM or a loan of equipment which ASIM intended to buy); Pls.' RICO Case Statement ¶ 15 (stating that "Griffin invested approximately of [sic] $70,000.00 in capital contribution" and that "[a]pproximately $60,000.00 of that contribution was for manufacturing equipment and the physical plant used by [ASIM]").) Signifi-

agreed to loan ASIM over $1 million, secured by a first security interest in all of the assets of ASIM and personal guarantees from Fenton, Griffin, Onken, and Odle.

ASIM was organized and began operating in January 1996. Griffin, Fenton, Onken, and Odle each received a 25% interest in the company. Although Griffin alleges that the initial agreement was that he was to own 60% and Fenton (or Fenton and Onken) was to own 40% of the company, Griffin learned at or following the initial meeting with NBD that he would only have a 25% interest in ASIM. Pursuant to a voting agreement signed by all of the shareholders on January 3, 1996, the shareholders agreed that ASI would be the exclusive sales representative and that H & A would be the exclusive parts supplier for ASIM. In addition, the shareholders agreed that Fenton and Griffin would receive annual management fees in the amount of $100,000. (*See* Voting Agreement, Onken's and Odle's Br.Supp.Ex. B.)

ASIM began to experience financial problems within only a few months after commencing operations. By May 1996, ASIM was in default on several loan covenants and out of formula on its loans.[6] By June, the company's financial condition had become a serious concern to NBD.[7] Thus, on June 13, the shareholders held a meeting to formulate a plan to bring ASIM back into compliance with the loan requirements. Griffin, acting for the other shareholders, communicated the results of that meeting to NBD. Under the plan, Odle was responsible for finding an experienced plant manager to run the operations, Griffin was responsible for finding an investor to put additional capital into the company, and Onken was responsible for increasing production. (*See* Letter from Griffin to Fedewa of 6/24/96, NBD's Br.Supp.Ex. B.)

## C. The Sale of ASIM

In late June, Fenton began to discuss a possible sale of the company with Dan Bloom ("Bloom"), the president of Wayne. Discussions with Bloom continued into July. On July 25, Griffin and Onken met with NBD and advised the loan officer, Bruce Fedewa, that they did not have an investor, they had decided to sell the company, and were waiting for a proposal from Wayne. (*See* Fedewa Notes of 7/25/96, Onken's and Odle's Br.Supp.Ex. E.) On July 31, ASIM's loans with NBD became due. (*See* Credit Authorization Agreement ¶ 1.1, NBD's Br.Supp.Ex. D.) However, ASIM had not found a buyer and had no way to repay the loan.

On or about July 29, Wayne made an offer to the shareholders to purchase the assets of ASIM. Approximately one week later, Wayne conveyed its previous offer to NBD, NBD's attorneys, and ASIM's shareholders. The purchase price was tentatively determined to be $675,000. All of the shareholders, except Griffin, approved the offer. On August 15, NBD's attorneys sent a collateral surrender agreement to the shareholders and ASIM's counsel, pursuant to which ASIM would agree to turn over its assets to NBD. On August 22, Griffin met with attorneys from the law firm of Warner, Nor-

---

cantly, Griffin represented to NBD at the time the loans were obtained that the equipment belonged to ASIM. (*See* ASIM Equipment List, NBD's Reply Br.Ex. D; Griffin Dep. at 32, 24, attached to NBD's Reply Br.)

**6.** For example, by March 31, 1996, ASIM had a net worth of $20,987 while the loan documents required a minimum net worth of $240,000, the company's leverage ratio was 49.67:1 versus a "not to exceed" requirement in the loan documents of 2.7:1, and a current ratio of 0.89:1 versus a ratio of "not less than

1.30:1" in the loan documents. (Letter from Fedewa to Onken of 5/20/96, Pls.' Ex. NBD 0296.)

**7.** By July, ASIM had lost over $375,000 from its first six months of operations and had trade payables that totaled $536,000, which included a significant debt owed to H & A. (*See* ASIM Profit & Loss Statement for Jan. – June 1996, GRF 0494–96, attached to Wayne/Haulin's Br.; ASIM Accounts Payable Summary of 7/10/96, NBD 0171–72, attached to Wayne/Haulin's Br.Supp.)

cross & Judd to explore the possibility of stopping the sale to Wayne or negotiating a favorable supply agreement with Wayne that would permit H & A to recoup its unsecured receivable from ASIM. Griffin's counsel, Timothy Hillegonds, contacted NBD's counsel and indicated that Griffin would seek an injunction if NBD attempted to go through with the sale to Wayne without Griffin's consent. NBD, through its counsel, agreed to a standstill and agreed to meet with Griffin and his counsel the following day. The next day, August 23, Griffin, his friend, Dave Hegan, and Griffin's counsel met with NBD and its counsel to discuss the situation. As a result of the meeting, NBD agreed to give Griffin time to put together an alternate proposal. The length of time is subject to dispute. Griffin claims that no time was mentioned and that NBD promised it would not sell to Wayne without Griffin's consent, while NBD contends that it agreed to give Griffin until noon the following Monday, August 26.

On August 26, Fenton, Onken, and Odle executed the collateral surrender agreement. After confirming with Griffin's counsel that Griffin did not have an alternative buyer for the assets, NBD sold the company's assets to Haulin, which Wayne had formed to purchase the ASIM assets, for a purchase price of $715,000.[8] As part of the deal, Fenton, Onken, and Odle each paid between $6,000 – $7,000 pursuant to their personal guarantees. NBD wrote off the remaining $5,000 deficiency as a loss, and released all of the shareholders from their personal guarantees, including Griffin, who paid nothing. As a part of the sale by NBD to Wayne, ASI sold certain assets, including open customer orders, to Haulin on October 10, 1996.

8. This figure was derived by adding 75% of the value of the inventory, 100% of the amount of the receivables, and the cost of certain machinery and equipment.

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.[9] Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1871)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi*, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.

9. Although Fenton has brought his motion as a motion to dismiss, the Court will treat the motion as one for summary judgment because Fenton relies upon matters outside the pleadings in support of his motion. *See* Fed. R.Civ.P. 12(b).

1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

### A. RICO Violations

In Count X of their complaint, Plaintiffs allege that Defendants violated §§ 1962(b), (c), and (d) of RICO. Section 1962(b) provides in relevant part that:

It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b). Section 1962(c) provides, in relevant part, that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Section 1962(d) prohibits conspiracies to violate sections 1962(a) –(c). *See* 18 U.S.C. § 1962(d).

### 1. Section 1962(b) Claim

Plaintiffs allege that Fenton, Onken, Odle, NBD, and Wayne/Haulin violated § 1962(b) by entering into a fraudulent scheme to deprive Griffin of his interest in ASIM and to deprive H & A of the amount that ASIM owed to it. For purposes of this claim, Plaintiffs allege that ASIM was the RICO enterprise. Defendants contend that Plaintiffs' § 1962(b) claim fails because they cannot show a "pattern," the requisite predicate acts required for "racketeering activity," and other necessary elements of their claim.

#### a. Proof of a "Pattern"

To establish a "pattern of racketeering activity," a plaintiff is required to prove two or more acts of racketeering activity. *See* 18 U.S.C. § 1961(5). While the statute provides that a RICO pattern requires a minimum of two acts of racketeering, the courts have held that the existence of two predicate acts are, by themselves, generally not sufficient to support a RICO claim. Rather, a plaintiff must show that the predicate acts "are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). In *H.J. Inc.*, the Court found that while a pattern may be shown by only two predicate acts, a RICO pattern requires something more than a showing that more than one predicate act was committed. *See id.* at 238, 109 S.Ct. at 2900. What a plaintiff must show is "that the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *Id.* at 240, 109 S.Ct. at 2901. The Court observed that the concept of continuity "is both a closed- and open-ended concept, referring to either a closed period of repeated conduct, or to past conduct that by is nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. With respect to closed-end schemes, the Court held that:

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*Id.* at 242, 109 S.Ct. at 2902. Continuity may be shown where: (1) "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit"; (2) "the predicate acts or offenses are part of an ongoing

entity's regular way of doing business"; or (3) "the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business the exists for criminal purposes). . . ." *Id.* at 242–43, 109 S.Ct. at 2902.

■ The determination of whether the alleged predicate acts "establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.* at 242, 109 S.Ct. at 2902. However, factors that are helpful in assessing whether the continuity requirement has been met include: (1) the number and variety of predicate acts; (2) the length of time over which the acts were committed; (3) the number of victims; (4) the presence of separate schemes; and (5) the occurrence of distinct injuries. *See Olive Can Co., Inc. v. Martin,* 906 F.2d 1147, 1151 (7th Cir.1990) (quoting *Morgan v. Bank of Waukegan,* 804 F.2d 970, 975 (7th Cir.1986)); *Barticheck v. Fidelity Union Bank,* 832 F.2d 36, 39 (3d Cir.1987). The scheme at issue is a closed-end scheme.[10]

■ The Sixth Circuit has applied the continuity requirement of *H.J., Inc.* under various factual settings. In *Thompson v. Paasche,* 950 F.2d 306 (6th Cir.1991), the court reversed a jury verdict and held that an alleged closed-end scheme by a real estate developer did not present the possibility of a continuing opportunity or scheme. The defendant in that case subdivided a piece of property into 19 lots. When the defendant sold the lots to the plaintiffs, he included protective covenants, one of which reserved the mineral rights to himself, ostensibly for the purpose of preventing development of those rights. At the same time, however, the defendant was negotiating an oil and gas lease with a third party. The court held that the alleged scheme "was an inherently short term affair." because "[o]nce he sold all of the lots, the scheme was over." *Id.* at 311. In addition, the court noted that the scheme lasted for only four months. *See id.* at 308, 311.

In *Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir.1994), the dispute concerned a contract under which the defendant was to build a paint finishing system for the plaintiff. In affirming the district court's dismissal, the court of appeals held that when only the related acts were considered, the time period of the alleged scheme lasted only seventeen months, which failed to meet the continuity requirement. *See id.* at 134. The court found that the plaintiff "alleged a single fraudulent scheme . . . to misrepresent a guaranteed price in a building contract, and later to extort a higher price from Vemco." *Id.* In addition, the court noted that there were "no facts pleaded suggesting anything but that once [the defendant] received the money it was requesting in the billing statements, its scheme would be over, and it would end its association with Vemco." *Id.* at 135.

Applying the continuity and relatedness requirements of *H.J., Inc.* as well as holdings in *Thompson* and *Vemco* to the genuine and material facts asserted by Plaintiffs, the Court finds that Plaintiffs have failed to demonstrate the existence of a RICO pattern.

### Fenton, Onken, and Odle

Plaintiffs allege that Defendants used ASIM to perpetrate a scheme to deprive them of their respective interests in ASIM which, in Griffin's case, was his ownership interest in ASIM and his management fee, and in H & A's case, was the receivable

---

**10.** Plaintiffs contend that the scheme satisfies both the open and closed ended requirements of *H.J., Inc.* The Court disagrees. Plaintiffs contend that the scheme is open ended because NBD is currently providing financing to Haulin and Fenton is on Haulin's payroll. These facts do not establish a continuing scheme. The scheme which Plaintiffs allege was accomplished on August 26, 1996, when Wayne/Haulin bought ASIM's assets from NBD and, "therefore, had a natural ending with no threat of continued criminal activity." *Olive Can Co.,* 906 F.2d at 1151. There is no support in the record to show conduct projecting in the future with a threat of repetition.

owed by ASIM. More specifically, Plaintiffs claim that Defendants accomplished their intended results through the surrender of assets to NBD and the sale to Wayne/Haulin.

The undisputed facts show that the alleged scheme was of a relatively short duration. The scheme began, at the earliest, in October 1995 when Fenton first approached Griffin with the proposal to form a manufacturing company and Onken and Odle began preparing the business plan. Such a finding, however, is based upon a generous, and possibly unwarranted, interpretation of the evidence before the Court because the evidence does not support a reasonable inference that Fenton, Onken, or Odle had discussed or considered a sale of ASIM's assets to a third party in October 1995. A more reasonable view is that the alleged scheme did not begin until June 1996, when the shareholders first adopted a plan to bring ASIM back in line with NBD's loan requirements. Nonetheless, regardless of which date is used, the alleged scheme came to an end on August 26, 1996, when ASIM surrendered its assets to NBD and NBD sold them to Wayne/Haulin. The scheme could not have continued past that time because the purposes of the scheme had been accomplished. *See Thompson,* 950 F.2d at 311 (finding that alleged scheme based on sale of property was completed when property was sold and there was no showing of continuing opportunity or scheme); *Crane Constr. v. Wal–Mart Stores, Inc.,* No. 93–2803–H/V, 1996 WL 495550, at *4 (W.D.Tenn. Mar.21, 1996) (finding that alleged scheme by the defendant to deprive the plaintiff of amounts owed for construction projects could not continue past the point where the defendant terminated the plaintiff on the projects). Thus, the scheme lasted, at most, only eleven months.

Plaintiffs attempt to extend the scheme backward and forward by citing various other alleged predicate acts. To extend the scheme backward, Plaintiffs claim that Fenton committed fraud on his customers by taking deposits from them and representing that he could provide trailers when he did not have a manufacturer. Plaintiffs also claim that Fenton committed fraud on other manufacturers, such as Wabash, by not paying them. These alleged acts do not support Plaintiffs' position because they were not related to the conduct directed at Plaintiffs. The conduct directed at Plaintiffs and the conduct directed at Fenton's customers and other manufacturers had "distinct and dissimilar 'purposes, results, participants, victims, or methods of commission.'" *Vild v. Visconsi,* 956 F.2d 560, 566 (6th Cir.1992) (quoting *H.J., Inc.*). Plaintiffs have not shown that they were injured in any way by Fenton's alleged failure to pay other manufacturers or his misrepresentations to his customers. While it is not necessary that a RICO plaintiff "be directly harmed by all the alleged predicate acts ... [Plaintiffs], under the circumstances of this case, may not use unrelated predicate acts that allegedly may have harmed ultimate purchasers or other third parties not similarly situated to [Plaintiffs]." *Id.* at 567.[11]

Plaintiffs also attempt to extend the scheme forward by arguing that the sale of certain ASI assets to Wayne/Haulin in October of 1996 was part of the alleged scheme. Although that sale was related to the August sale of ASIM's assets in the sense that it was a condition of Wayne/Haulin's purchase of ASIM's assets, it could not have harmed either Griffin or H & A because Griffin did not have an interest in ASI and ASI did not owe a debt to H & A. Moreover, even if the October 1996 sale is considered as part of the alleged scheme, the scheme would have lasted for only about twelve months,

---

**11.** Apart from failing to meet the "relatedness" requirement, there is no evidence in the record which shows that any of ASI's customers did not actually receive the trailers that they ordered. Moreover, there is no indication in the record that the debts which ASI allegedly failed to pay other manufacturers resulted from fraud by ASI or Fenton.

which is still too short to establish the continuity requirement. *See Vemco,* 23 F.3d at 134.

In addition to the relatively brief duration, the number of victims—two—and the variety of predicate acts weigh against a finding that the scheme would have been repeated in the future. All of the alleged predicate acts were performed to further a single scheme which was accomplished when ASIM's assets were sold to Wayne/Haulin. In short, "there is no indication of any continuing opportunity or scheme...." *Thompson,* 950 F.2d at 311.

### NBD & Wayne/Haulin

The Court's discussion with regard to defendants Fenton, Onken, and Odle applies with the same force to NBD and Wayne/Haulin because their participation was limited to the same scheme. In addition, NBD's and Wayne/Haulin's participation in the alleged scheme was more limited in terms of time and conduct. Although NBD was involved with ASIM as early as November 1995, it acted only as a lender on a single loan. In *Terry A. Lambert Plumbing, Inc. v. Western Security Bank,* 934 F.2d 976 (8th Cir.1991), the plaintiff alleged a RICO claim based upon conduct similar to that of NBD in this case. The plaintiff in that case had obtained a loan from the defendant bank. Shortly after the loan proceeds were disbursed, the bank determined that the plaintiff was in default under the loan documents. The plaintiff was unable to cure the default and the bank foreclosed on the plaintiff's assets. Affirming the district court's grant of summary judgment, the court of appeals held that the plaintiff failed to allege a threat of continued fraudulent activity by the bank. *See Lambert,* 934 F.2d at 981. The court observed that the case "involve[d], at most, a plan to defraud a single company in connection with a single set of loan agreements" and found "no support in the record that a criminal scheme exist[ed] involving [the bank] over a long period of time in connection with more than one victim." *Id.* Simi-

larly, the present case involves only a single loan by NBD and Plaintiffs have failed to show any continuing criminal scheme by NBD over a long period of time with respect to any other victims.

Wayne/Haulin was involved in the alleged scheme for only two months and its conduct was limited to the purchase of ASIM's assets. Plaintiffs have not presented any evidence to demonstrate that Wayne/Haulin was involved in any way with the alleged scheme prior to June 1996, when it first expressed an interest in purchasing ASIM's assets and, as with the other defendants, Wayne/Haulin's participation ended with its purchase of ASIM's assets.

### b. Predicate Acts

Plaintiffs allege mail fraud and wire fraud as the predicate acts for racketeering activity. To establish mail or wire fraud, a RICO plaintiff must prove: (1) a scheme or artifice to defraud; and (2) use of the mails or interstate wires for the purpose of executing the fraudulent scheme. *See Bender v. Southland Corp.,* 749 F.2d 1205, 1215–16 (6th Cir.1984). Defendants contend that Plaintiffs' RICO claim is deficient because they have failed to allege the elements of mail or wire fraud.

To prove mail or wire fraud, a plaintiff is required to prove a misrepresentation or omission which was " 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' " *Blount Fin. Serv. v. Walter E. Heller & Co.,* 819 F.2d 151, 153 (6th Cir.1987) (quoting *United States v. Van Dyke,* 605 F.2d 220, 225 (6th Cir. 1979)). A plaintiff who claims fraud must allege that the defendant acted with intent to defraud, although it is a matter that may be averred generally under Fed. R.Civ.P. 9(b). *See Bender,* 749 F.2d at 1216. In addition, a plaintiff must allege "facts showing the plaintiff's reliance on defendant's false statement of fact." *Blount,* 819 F.2d at 152. Failure to allege either element requires dismissal. *See*

*Central Distributors of Beer, Inc. v. Conn,* 5 F.3d 181, 184 (6th Cir.1993).

### NBD

■ In their RICO case statement, Plaintiffs identified a single, wrongful act by NBD, namely, its breach of an alleged agreement "not to conduct a *de facto* sale of" ASIM. (Pls.' RICO Case Statement ¶ 5.) The act of breaching a contract is insufficient to support a mail or wire fraud claim. As the Sixth Circuit has noted, "[a] claim of fraud does not inevitably follow from every breach of contract." *Kenty v. Bank One,* 92 F.3d 384, 390 (6th Cir.1996). Instead, a plaintiff must allege and prove that a defendant acted with intent to defraud and made a false statement of material fact. *Blount,* 819 F.2d at 152; *Bender,* 749 F.2d at 1216. Plaintiffs have failed to show either element in connection with NBD's alleged promise.

Attempting to bolster their claim, Plaintiffs contend that NBD also committed predicate acts when it: (1) forced ASIM to surrender the collateral without complying with the loan documents; and (2) conducted a sale to ASIM for less-than fair market value. Neither of these acts constitute fraud because Plaintiffs have not shown that NBD made any false or misleading statements in connection with either of these acts. Furthermore, with regard to the surrender of collateral, the evidence shows that the loans, which matured and were due on July 31, 1996, were in default at the time NBD took possession of the collateral. In addition, the loans were in default by reason of ASIM's breach of its loan covenants.[12] Because NBD had the right to repossess the collateral pursuant to the continuing security agreement signed by ASIM, it was entitled to the collateral to satisfy the debt. With regard to Plaintiffs' contention that the sale to

Wayne/Haulin was commercially unreasonable, the Court notes that the issue is not the subject of the present motions. However, the evidence in the record shows that the issue of finding an additional investor or a potential purchaser for the business was discussed as early as June, and Griffin had over two months to find an investor or another buyer that was acceptable to all parties. There is no evidence that NBD hand-picked Wayne/Haulin to buy the ASIM assets or that there was any agreement between NBD and any other defendant that no other purchasers or solutions would be considered.

### Wayne/Haulin

■ Plaintiffs did not identify any predicate act in their RICO case statement that was committed by Wayne/Haulin. In their response brief, Plaintiffs allege that Wayne/Haulin committed fraud by: (1) failing to pay ASIM's debt to a payroll company which it assumed as part of its purchase of ASIM's assets; and (2) conspiring with the other defendants to pay less than fair value for the ASIM assets. Neither act can support a fraud claim because Plaintiffs have not shown that Wayne/Haulin made a misleading misrepresentation or omission in connection with either act. In addition, Plaintiffs' evidence shows that debt to the payroll company was in fact paid. (*See* Onken Dep. II at 39, attached to Pls.' Exs.) With regard to the price paid by Wayne/Haulin, as noted above, Plaintiffs' evidence does not show that the sale or the amount paid by Wayne/Haulin was the product of any agreement among the defendants to pay less than fair value for the assets or to exclude other potential purchasers from making an offer.[13]

---

**12.** Although NBD agreed to waive the defaults in the loan covenants until July 31, 1996, there is no evidence that NBD agreed to extend the waiver past that time.

**13.** In fact, notes taken by Plaintiffs' counsel in a conversation on August 24, 1996, with Pat

Keating, Wayne/Haulin's attorney, show that Mr. Keating wanted to know if another company had made a bid so that he could avoid a trip to Grand Rapids the following Monday to close on the purchase. (*See* Grow notes of 8/24/96, NBD's Br.Supp.Ex. C.)

### Onken & Odle

■ In their complaint and in their RICO case statement, Plaintiffs allege several acts involving Onken and Odle which served to further the scheme. However, most of the alleged acts were statements made by Fenton rather than Onken and Odle. (*See* Compl. ¶ 109A—Z; Pls.' RICO Case Statement ¶ 5.) The only acts attributable to Onken and Odle which had any relationship to the scheme were: (1) Odle's failure to contribute their capital contributions of $100,000 each (*see* Compl. ¶ 109(O)); (2) Onken's and Odle's decision not to pay H & A the $220,000 owed by ASIM (*see id.* ¶ 109(T)); (3) Onken's and Odle's breach of an alleged agreement not to sell ASIM's assets to Wayne/Haulin without Griffin's consent (*see* Pls.' RICO Case Statement ¶ 5); and (4) their "material misrepresentations" in the business plan which "concealed [their] plan to obtain effective ownership and control over" ASIM (*id.*).

Plaintiffs cannot establish fraud through Odle's failure to make his capital contribution or Onken's and Odle's breach of an agreement not to sell to Wayne/Haulin because such acts amount to no more than breaches of contract. *See Kenty,* 92 F.3d at 390. Similarly, Plaintiffs have not shown that Onken's or Odle's decision not to pay H & A constituted an act of fraud. *See Bender,* 749 F.2d at 1216. The Court also rejects Griffin's assertion that Fenton, Onken, or Odle used the business plan to deceive Griffin regarding his share in the business or that the business plan concealed the other shareholder's plan to gain effective control of ASIM. The evidence shows that Griffin knew well in advance of the formation ASIM of the loan by NBD that he would only own a 25% interest. In fact, Griffin admits that he learned this fact at the November meeting with NBD, but did not object. Griffin's explanation that he was "in too far" to object has no support in the evidence, because at that time ASIM had not been formed and the shareholders had no incurred any financial obligations on behalf of the company. Because Griffin knew that he would only own 25% of the company and was in as good a position as the other defendants to "discover" that he could be outvoted, any reliance by Griffin would have been unreasonable. *See Blount,* 819 F.2d at 153.

### c. Acquisition of an Interest in the Enterprise

■ To be liable under § 1962(b), a defendant must have "acquire[d] or maintain[ed], directly or indirectly, [an] interest in or control of [an] enterprise ...." 18 U.S.C. § 1962(b). NBD and Wayne/Haulin argue that they cannot be held liable under § 1962(b) because they did not acquire an interest in, or control of, ASIM. In addition, Onken and Odle contend that they cannot be held liable under § 1962(b) because they disposed of, rather than acquired, an interest in ASIM.

The RICO statute does not define "control" or "interest," and few cases have addressed the issue of what constitutes an "interest in or control of any enterprise" for purposes of § 1962(b). However, in *Moffatt Enterprises, Inc. v. Borden, Inc.,* 763 F.Supp. 143 (W.D.Pa.1990), the court engaged in an extensive analysis of the meaning of "control" in the context of a distributor relationship. The court first examined the language of the exception in § 1962(a) to the prohibition of investment of proceeds of racketeering in an enterprise engaged in or affecting interstate commerce or, which provides that:

A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer ... shall not be unlawful under this subsection if the securities ... do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer ... the power to elect one or more directors of the issuer.

*Id.* at 147 (quoting § 1962(a)) (italics in original). The court found "that the use of the term 'control' in subsection (a) is in the

context of the 'control' one gains in a corporation by acquiring sufficient stock to elect one or more of its directors." *Id.* The court then examined RICO's legislative history and determined that subsections (a) and (b) are to be read together. On that basis, the court found that "the 'interest' contemplated in both § 1962(a) and § 1962(b) is in the nature of a proprietary one, such as the acquisition of stock, and that the 'control' contemplated is in the nature of the control one gains through the acquisition of sufficient stock to affect the composition of a board of directors." *Id.* Applying its interpretation to the facts of the case, the court concluded that the defendants did not control the enterprise because "[t]he controls asserted [were] primarily those that are the normal contractual incidents of a typical distributorship agreement." *Id.* at 148.

A case more on point with regard to NBD's status in this case is *NCNB National Bank of North Carolina v. Tiller,* 814 F.2d 931 (4th Cir.1987), *overruled on other grounds, Busby v. Crown Supply, Inc.,* 896 F.2d 833 (4th Cir.1990) (en banc). In that case, a bank sued guarantors of corporate loans to collect the unpaid balances of the loans. The defendants filed counterclaims against the bank, including a claim under RICO. The guarantors alleged that the bank violated § 1962(b) by acquiring and maintaining control of the corporate borrowers through a pattern of racketeering. In particular, the guarantors alleged that the bank had control over the corporations by virtue of its "right to demand payments on the notes" and its ability to keep the borrowers "apprehensive about the possibility of foreclosure." *Id.* at 936. The court of appeals found the guarantors' argument "ludicrous" and stated that the bank's "only interest in either company was in its status as a secured lender." *Id.* Of greater significance is the court's observation that:

> The normal incidents of a borrower-lender relationship, including monitoring, protection and disposition of collateral, do not amount to control. Actual

day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had control over a borrower.

*Id.*

Like the bank in *NCNB,* NBD's only role in relation to ASIM was that of a lender with a first secured interest in ASIM's assets. NBD did not exercise any control over ASIM, nor did it acquire any interest in ASIM. By taking possession of ASIM's assets, NBD was enforcing its rights against the collateral. Moreover, NBD did not use the assets to operate any kind of business or enterprise. Thus, NBD cannot be liable under § 1962(b).

■ The Court also concludes that Wayne/Haulin cannot be held liable under § 1962(b) because it did not acquire any interest in or have control over ASIM. Wayne/Haulin merely acquired the assets of ASIM to operate a new company; the enterprise—ASIM—remained intact. While Wayne/Haulin continued to conduct the same type of business as ASIM, Haulin, the purchasing entity, had entirely different owners and directors and was not a mere continuation of ASIM.

Using the same analysis, the Court must reject Onken's and Odle's argument because they did in fact acquire interests in and control of ASIM. Although they contend that they divested themselves of their interests in ASIM by consenting to the surrender of assets to NBD, they continued to own their interests in the entity. However, to be liable under § 1962(b), a defendant must acquire an interest in or control of an enterprise as a result of racketeering. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1190 (3d Cir. 1993). Because the Court has already found that Onken and Odle did not commit any predicate acts, they could not have acquired their interests in ASIM through racketeering.

## 2. Section 1962(c) Claim

■ Plaintiffs have identified ASI as the enterprise for their § 1962(c) claim. Plaintiffs contend that Fenton, Onken, and Odle used ASI to defraud them of their interests in ASIM. Because Plaintiffs must also prove a pattern in order to succeed on their § 1962(c) claim, the Court finds that Defendants are entitled to summary judgment for the reasons discussed above.

As another ground for summary judgment, Onken, Odle, NBD, and Wayne/Haulin contend that they are entitled to summary judgment because they did not participate in the operation or management of ASI. To establish a RICO violation under § 1962(c), a plaintiff must show that the defendant conducted or participated in, "directly or indirectly, [ ] the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Supreme Court held that with respect to the control requirement, only persons who "participate in the operation or management of the enterprise itself" can be held liable for RICO violations under § 1962(c). *Id.* at 185, 113 S.Ct. at 1173. Under *Reves,* courts must focus on whether the defendant participated or conducted in the enterprise's affairs, as opposed to simply the defendant's own affairs. *See Stone v. Kirk,* 8 F.3d 1079, 1090–91 (6th Cir.1993) (citing *Reves* ).

Plaintiffs have failed to present any evidence that Odle, Wayne/Haulin, or NBD participated in the conduct of ASI's affairs. Other than Fenton, Onken is the only defendant who had any connection with ASI that would be sufficient to meet the participation test or *Reves.* It is undisputed that Onken was employed as the vice-president of operations for ASI from approximately March 1995 through December 1995, when he left to become the president of ASIM. Onken's responsibilities at ASI included supervising production of trailers and locating manufacturers for the trailers. Based upon his position as an officer of ASIM with supervisory responsibilities, there is a sufficient basis for finding that Onken was involved in making and carrying out decisions for ASIM. *See La-Salle Bank Lake View v. Seguban,* 937 F.Supp. 1309, 1321–22 (N.D.Ill.1996) (noting that § 1962(c) liability is not limited to upper-level management and finding assistant teller manager for defendant bank exercised sufficient supervisory power to meet participation test under Reves). However, because Onken left ASI at the end of 1995, he cannot be liable under § 1962(b) for any acts of racketeering that occurred after his departure. *See United States v. Antar,* 53 F.3d 568, 580 (3d Cir.1995).

## 3. Section 1962(d) Claim

■ Because Plaintiffs have failed to allege a "pattern of racketeering," they have also failed to prove a claim under § 1962(d). *See Religious Technology Center v. Wollersheim,* 971 F.2d 364, 367 n. 8 (9th Cir.1992) (per curiam). Therefore, summary judgment will also be granted on this claim.

## B. State Law Claims

■ Having concluded that Defendants are entitled to summary judgment on Plaintiffs' RICO claim, which was the only basis for federal jurisdiction, the Court must decide whether it will exercise its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' state law claims. "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996) (citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank,* 738 F.2d 163, 166 (6th Cir.1984)). In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp.,* 994 F.2d 1178, 1182

(6th Cir.1993) (affirming district court's order granting summary judgment on federal claim and dismissing state law claims without prejudice). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson,* 89 F.3d at 1254–55.

The Court finds that the balance of considerations in this case weigh against the Court exercising its supplemental jurisdiction. First, there are no significant issues of judicial economy because the case is not so far advanced that litigation in a different court would result in a duplication or waste of judicial resources. Discovery has not yet closed, and although Wayne/Haulin and NBD have moved for summary judgment on some of the state claims, one or more of the defendants has indicated that additional motions for summary judgment are anticipated on Plaintiffs' other claims. Second, while many of the claims raised by Plaintiffs involve garden-variety state law torts, some of the claims, such as the contract claims against NBD, may involve novel issues of state law. Based upon these considerations, the Court will decline to exercise its supplemental jurisdiction and remand the remaining claims to state court pursuant to 28 U.S.C. § 1367(c).

### Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions for Summary Judgment on Plaintiffs' RICO claims and remand Plaintiffs' state law claims to Muskegon County Circuit Court pursuant to 28 U.S.C. § 1367(c).

An Order consistent with this Opinion will be entered.

### ORDER

In accordance with the Opinion filed on this date,

**IT IS HEREBY ORDERED** that Defendant Fenton's Motion to Dismiss (docket no. 80) and Defendants Onken's and Odle's Motion for Summary Judgment (docket no. 83) are **GRANTED,** and Defendants Wayne Metal Products Company, Inc.'s and Haulin Trailers, LLC's Motion for Summary Judgment (docket no. 82) and NBD's Motion for Partial Summary Judgment (docket no. 85) are **GRANTED IN PART.** Count X (RICO) is **DISMISSED WITH PREJUDICE.** Plaintiffs' state law claims are **REMANDED** to Muskegon County Circuit Court pursuant to 28 U.S.C. § 1367(c).

This concludes all proceedings in this case.